IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

**WILD VIRGINIA, INC.,**

       **Plaintiff,**

  **v.**                                             CIVIL ACTION NO. 3:25cv1043

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; LEE ZELDIN,
in his official capacity as Administrator of
U.S. Environmental Protection Agency;
AMY VAN BLARCOM-LACKEY, in her
official capacity as Regional Administrator
for U.S. Environmental Protection Agency
Region III,**

       **Defendants.**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      In this civil action for declaratory judgment and mandatory injunctive relief, Plaintiff Wild Virginia challenges the United Stated Environmental Protection Agency's ("EPA") failure to perform non-discretionary duties under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1201 *et seq.*, in response to the Virginia Department of Environmental Quality's ("VDEQ") submission of its list of the Commonwealth's impaired streams that does not meet the requirements of CWA sections 303(d) and 305(b). Plaintiff also challenges Defendants' actions in response to VDEQ's submission as arbitrary and capricious and not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

2.      As detailed below, Wild Virginia alleges that VDEQ's list of "impaired" waterbodies, i.e., those waters that fail to satisfy water quality standards, included in its 2024 305(b)/303(d) Water Quality Assessment Integrated Report"("Integrated Report") fails to satisfy CWA sections 303(d) and 305(b) because it fails to identify any waters as impaired by per- and

polyfluoroalkyl substances ("PFAS") despite abundant evidence in VDEQ's possession showing that many waters in the state are contaminated by the toxic chemicals such that the waters cannot support their designated uses under the CWA, including certain waters for which the Commonwealth has issued a fish consumption advisory due to high PFAS levels found in fish tissue.

3.      PFAS are a large and diverse structural family of compounds used in a myriad of commercial applications due to their unique properties, such as resistance to high and low temperatures, resistance to degradation, and nonstick characteristics. "PFAS tend to break down slowly and persist in the environment, and consequently, they can accumulate in the environment . . . over time." U.S. EPA, *PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32,532, 32,532 (April 26, 2024). That property has led PFAS to be "known as forever chemicals." *See Ctr. for Envtl. Health v. Regan*, 103 F.4th 1027, 1031 (4th Cir. 2024).

4.      PFAS are toxic to human health. 89 Fed. Reg. at 32,544. Research has shown that exposure to PFAS is linked to cancer, liver damage, birth defects, and other health problems. *See id.* at 32,537 ("The adverse health effects associated with exposure to such PFAS include (but are not limited to): effects on the liver (e.g., liver cell death), growth and development (e.g., low birth weight), hormone levels, kidney, the immune system (reduced response to vaccines), lipid levels (e.g., high cholesterol), the nervous system, and reproduction, as well as increased risk of certain types of cancer."); *see also W. Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 793 F. Supp. 3d 790, 798 (S.D.W. Va. 2025) (preliminarily enjoining PFAS discharges and explaining that "Congress, the Environmental Protection Agency, and the state of West Virginia have recognized that forever chemicals like PFAS and HFPO-DA are dangerous, persistent, and mobile pollutants" increased exposure to which "puts the public health at risk"). EPA "reviewed

2

the weight of the evidence" and determined that two specific PFAS—perfluorooctanoic acid (PFOA) and perfluorooctane sulfonic acid (PFOS)—"are likely to be carcinogenic to humans." U.S. EPA, *EPA Efforts to Reduce Exposure to Carcinogens and Prevent Cancer*. EPA's drinking water standards set Maximum Contaminant Level Goals (MCLGs) for PFOS and PFOA at zero, which "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts." U.S. EPA, presentation: *Final PFAS National Primary Drinking Water Regulation.*

5.    When faced with VDEQ's inadequate Integrated Report that failed to address the abundant available data regarding PFAS pollution, EPA was required to disapprove the state's submission and develop its own list of waters in Virginia that do not satisfy water quality standards. EPA's failure to correct VDEQ's error leaves numerous waterbodies that are burdened with harmful levels of PFAS pollution unprotected from the remedial measures that would be required to bring those waters into compliance with water quality standards were they included in the Integrated Report, and frustrates efforts to inform the public of the widespread and potentially harmful levels of PFAS pollution in Virginia's waters.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 33 U.S.C. § 1365(a)(2) (CWA citizen suit provision); 5 U.S.C. § 702 (Administrative Procedure Act); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); and 28 U.S.C. §§ 2201–02 (power to issue declaratory judgments in cases of actual controversy).

7.    On September 4, 2025, Wild Virginia gave notice by certified mail to Defendants and the U.S. Attorney General that EPA had failed to perform nondiscretionary duties under the

CWA in response to VDEQ's submission of an inadequate Integrated Report and informed EPA that Wild Virginia would file a citizen suit if EPA did not satisfy its mandatory obligations within 60 days. Wild Virginia also informed EPA that it would bring an additional claim that EPA's approval of VDEQ's submission was arbitrary and capricious and not in accordance with law under the APA.

8.      More than 60 days have passed and EPA has yet to perform its non-discretionary duties that arose due to VDEQ's submission of its inadequate Integrated Report.

9.      Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occur in this District.

## PARTIES

10.      Plaintiff Wild Virginia is a 501(c)(3) nonprofit organization working to preserve and support the complexity, diversity, and stability of natural ecosystems by enhancing connectivity, water quality, and climate in the forests, mountains, and waters of Virginia. Wild Virginia has worked consistently to hold the government and regulators accountable for their duties to protect Virginia's land and people from the harms of PFAS and other threats.

11.      Wild Virginia is a "citizen" as that term is defined for the purposes of the CWA citizen suit provision. 33 U.S.C. §§ 1362(5), 1365(g).

12.      Wild Virginia's members suffer injuries to their aesthetic, recreational, environmental, and/or economic interests as a result of Defendants' failure to perform their nondiscretionary duties under the CWA to identify Virginia waters that are impaired by PFAS and Defendants' arbitrary action approving Virginia's inadequate Integrated Report. Plaintiff's members fish, swim, observe wildlife, or otherwise use waters that are affected by PFAS

4

pollution and that would benefit from the agency making an impairment determination. Members would benefit from the listing itself, as it would help them avoid or limit their uses of PFAS-impaired waters, and they would also benefit from any resulting measures to improve water quality in order to achieve water quality standards. Plaintiff's members' use and enjoyment of those waters are diminished and curtailed because of Defendants' failure to act and its unlawful actions.

13.    For example, Rob Whitehead is a member of Wild Virginia who has been fishing, kayaking, and swimming in the Chickahominy River and other waters throughout Virginia for over 25 years. Although he and his wife and son often eat the fish he catches, he fishes less and eats the fish less often in areas he believes to be contaminated with PFAS. Mr. Whitehead enjoys swimming when he is out fishing on hot days, but he will not get in the water in areas he believes to be contaminated with PFAS. He is also concerned about his drinking water, as it is sourced from the James River, which he believes may be contaminated with PFAS.

14.    Nancy Armour, another member of Wild Virginia, has a waterfront property on the Potomac River in Montross, Virginia, where she enjoys recreating on the River most weekends with her family. She and her family have eaten fish and seafood from the Potomac for about 20 years, but they now limit the amount they eat due to their concerns about PFAS-contaminated foods impacting their long-term health. Ms. Armour is also concerned about the drinking water at her family's other home in Woodbridge, Virginia. That drinking water is sourced from the Occoquan Reservoir, which Ms. Armour believes may be contaminated with PFAS.

15.    Defendant United States Environmental Protection Agency ("EPA") is the federal agency responsible for implementing and overseeing the States' implementation of the Clean

Water Act. Specifically, EPA is the agency responsible for approving or disapproving state reports of their waterbodies' compliance with water quality standards under CWA sections 303(d) and 305(b), and for promulgating adequate reports where states fail to do so.

16.    Defendant Lee Zeldin is the Administrator of EPA and is sued in his official capacity. The Administrator has ultimate authority for EPA's actions and inactions.

17.    Defendant Amy Van Blarcom-Lackey is the Regional Administrator for EPA Region III, which includes Virginia, and is sued in her official capacity. Pursuant to 40 C.F.R. § 130.7(d)(2), the Administrator has delegated his relevant authorities and nondiscretionary duties under CWA section 303 to the Regional Administrators.

## STATUTORY AND REGULATORY BACKGROUND

### Water Quality Standards

18.    Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The goal of the CWA is to eliminate "the discharge of pollutants into the navigable waters," and, in the interim, to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. §§ 1251(a)(1), (2).

19.    To achieve those ends, Section 303 of the Act requires each State to establish and implement water quality standards, subject to review and approval by EPA. 33 U.S.C. §§ 1313(a)–(c), 1362(3). Water quality standards consist of, *inter alia*, the "designated uses" of a State's waters and "the water quality criteria for such waters based upon such uses," and shall be such as "to protect the public health or welfare, enhance the quality of water and serve the purposes of" the Act. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 130.2(d). That is, the States' standards establish the maximum levels of pollution that a waterbody can withstand while still

supporting a particular designated use such as fishing, "contact recreation," i.e., swimming and wading, aquatic life support, or drinking water.

20.     As part of their water quality standards, States must also "develop and adopt a statewide antidegradation policy" that, among other things, ensures that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.'" 40 C.F.R. § 131.12.

21.     Water quality standards may include numeric criteria setting maximum pollutant concentrations as well as narrative criteria prohibiting conditions such as visible pollution (e.g., oily sheen or floating solids) or, more generally, prohibiting concentrations of pollutants that are harmful to human health or aquatic life. 40 C.F.R. § 130.7(b)(3).

22.     Virginia has adopted water quality standards, including designated uses, numeric and narrative criteria, and an antidegradation policy. 9 Va. Admin. Code § 25-260-5 *et seq*. Virginia regulations designate all state waters for the following uses: "recreational uses, e.g., swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; wildlife; and the production of edible and marketable natural resources, e.g., fish and shellfish." *Id.* § 25-260-10(A).

23.     Virginia does not have numeric water quality criteria for any PFAS. However, Virginia's narrative criteria state, in part, that:

> State waters, including wetlands, shall be free from substances attributable to sewage, industrial waste, or other waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life.

Specific substances to be controlled include, but are not limited to. . . toxic substances (including those which bioaccumulate) . . . .

*Id.* § 25-260-20(A).

24.    Virginia's antidegradation policy states that, "[a]s a minimum, existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." *Id.* § 25-260-30(1).

**State Submission of Water Quality Reports to EPA**

25.    CWA section 303(d) mandates that each state "shall identify those waters within its boundaries for which the [technology-based effluent limitations required for various industries by CWA section 301(b)] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(a). That is, the state is required to identify any waters that are not meeting water quality standards despite the implementation of effluent limits in discharge permits that are based on pollution control technologies . The "applicable" water quality standards "include[e] numeric criteria, narrative criteria, waterbody uses, and antidegradation requirements." 40 C.F.R. § 130.7(b)(3). Such lists must be submitted every two years. *Id.* § 130.7(d)(1).  These lists are commonly referred to as "303(d) Lists."

26.    In developing 303(d) Lists, States "are required to assemble and evaluate all existing and readily available water quality-related data and information, including for waters for which water quality problems have been reported by local, state, or federal agencies; members of the public; or academic institutions." U.S. EPA Office of Wetlands, Oceans, and Watersheds, "2024 Integrated Report Memorandum: Information Concerning 2024 Clean Water Act Sections 303(d), 305(b), and 314 Integrated Reporting and Listing Decisions," at 9 (citing 40 C.F.R. § 130.7(b)(5)). States "must use such data and information in developing the CWA 303(d) list

8

unless they provide a rationale not to" and "EPA will evaluate whether a state, territory, or authorized tribe provides a technical, science-based rationale for decisions not to use data or information." *Id.*

27.     EPA explains that "[i]t is important to note that the lack of an assessment methodology [for a particular type of pollutant or impairment] does not negate the requirement, in developing the CWA 303(d) list, to assemble and evaluate all existing and readily available water quality-related data and information and use such data and information to determine if all applicable [water quality standards] (including numeric and narrative criteria) are attained (unless a rationale is provided for not using particular data and information)." *Id.* at 15.

28.     Portions of waterbodies that are not meeting water quality standards despite application of technology-based controls are termed "water quality-limited segments," also known as "impaired waters," and are subject to a number of requirements designed to allow the waterbody to support applicable designated uses. 40 C.F.R. § 130.2(j). Those requirements include the development of total maximum daily loads (TMDLs). TMDLs establish the maximum quantity of a particular pollutant that the waterbody can receive per day while supporting designated uses—i.e., the maximum load. They further impose wasteload allocations, which apportion the maximum load among dischargers to the waterbody through effluent limitations in individual permits to achieve the necessary reductions to the maximum load.  *Id.* § 130.7.  Where a state fails to identify a waterbody as impaired, that waterbody will not receive a TMDL and associated pollutant reductions necessary to allow the waterbody to satisfy water quality standards will not be mandated.

29.     Once a state submits a 303(d) List to EPA, EPA must approve or disapprove the list within 30 days. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). EPA's decision requires it

to determine whether the state has provided a technical, science-based rationale for declining to use any available data to assess the impairment of its waters. 40 C.F.R. § 130.7(b)(5). If EPA disapproves the state's 303(d) List, EPA must identify the impaired waters itself—that is, develop its own, complete 303(d) List for the state—within 30 days of the disapproval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). If EPA develops its own 303(d) List, after a public comment period on that list or any revisions by EPA to the state's proposed list, EPA must send the 303(d) List to the state, and the state must incorporate EPA's 303(d) List into its water quality management plan. 40 C.F.R. § 130.7(d)(2).

30.    In addition to the requirements of section 303(d), CWA section 305(b) requires each state to provide a biennial report including "a description of the water quality of all navigable waters in such State" and "an analysis of the extent to which all navigable waters of such State provide for the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities in and on the water." 33 U.S.C. § 1315(b)(1)(A), (B). States, including Virginia, submit the report required by section 305(b) along with the 303(d) list in an Integrated Report.

31.    States are required to use the "water quality data and problems identified in the 305(b) report" to "develop water quality management (WQM) plan elements to help direct all subsequent control activities." 40 C.F.R. § 130.8(a). The water quality management plan constitutes the state's comprehensive goals and strategies for ensuring that its waters satisfy water quality standards. *See id.* §§ 130.2(k), 130.6. "Water quality problems identified in the 305(b) report should be analyzed through water quality management planning leading to the development of alternative controls and procedures for problems identified in the latest 305(b) report." *Id.* § 130.8(a); *see also id.* § 130.6(b) ("WQM plans draw upon the water quality

assessments to identify priority point and nonpoint water quality problems, consider alternative solutions and recommend control measures, including the financial and institutional measures necessary for implementing recommended solutions. State annual work programs shall be based upon the priority issues identified in the State WQM plan."). Waters that are not listed in the 305(b) report would not be subject to water quality management plan elements designed to address the problematic pollution.

32.    EPA must submit the 305(b) reports to Congress along with an analysis thereof, and the reports and analyses are available to the public. 33 U.S.C. § 1315(b)(2).

**Judicial Review of EPA Action and Inaction on State Submissions**

33.    CWA section 505(a)(2) authorizes any "citizen" to commence a civil action "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator," and provides the district courts with jurisdiction to "order the Administrator to perform such act or duty." 33 U.S.C. § 1365(a)(2). Citizen means "a person or persons having an interest which is or may be adversely affected," *id.* § 1365(g), and "person" means "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body," *id.* § 1362(5).

34.    The Administrative Procedure Act ("APA") provides that any person who has suffered legal wrong because of agency action or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review of that agency action. 5 U.S.C. § 702.

35.    The APA states that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." *Id.* § 706(2)(A). An agency's action is arbitrary and capricious if the agency relied on factors that Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or its explanation is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTS

### Virginia's 2024 Integrated Report

36.    On April 22, 2024, VDEQ released its draft "2024 305(b)/303(d) Water Quality Assessment Integrated Report." In comments submitted to VDEQ and EPA on May 22, 2024, Wild Virginia pointed out that the draft Integrated Report failed to include any analysis of the large body of data in VDEQ's possession showing PFAS contamination in surface waters, sediments, and fish tissue. Specifically, Wild Virginia identified 29,523 pieces of data on VDEQ's Statewide PFAS Sampling Dashboard, including 8,793 pieces of PFAS data taken from 83 separate sampling sites during the six-year assessment period covered by the draft Integrated Report. Those included results from analysis of PFAS in surface water, sediments, and fish tissue. Though it generally acknowledged the issue of PFAS pollution, the draft Integrated Report did not in any way assess the available PFAS data to determine whether any of Virginia's waters were not supporting their designated uses or otherwise violating water quality standards as a result of PFAS pollution, nor did it provide a "technical, science-based rationale" for failing to do so.

37.    In its comments, Wild Virginia drew particular attention to data showing substantially elevated levels of a particular PFAS chemical—a chemical alternatively known as

perfluorooctane sulfonic acid, perfluorooctane sulfonate, or "PFOS," which EPA has determined is harmful to human health and a likely carcinogen—in the Middle Chickahominy River watershed. Fish tissue data collected from each of eight monitoring stations in the river and connected White Oak Swamp showed significantly elevated PFOS levels in samples from numerous fish species. Of 31 fish samples collected during this reporting period, 19 (61 percent) exceeded 10,000 parts per trillion. The largest concentration, 68,200 parts per trillion, was found in Bluegill collected in White Oak Swamp. Those levels could easily lead to exceedance of PFOS consumption thresholds that various scientific and governmental bodies have established to protect human health. *See* The Agency for Toxic Substances and Disease Registry*, Guidance for Assessment of Per- and Polyfluoroalkyl Substance (PFAS) in Fish and Other Aquatic Organisms*, available at https://perma.cc/2ZL7-TP9C.

38.     On August 21, 2024, Virginia released a guidance document that established an acceptable concentration of PFOS in edible fish tissue of 0.01 parts per million, or 10,000 parts per trillion. Virginia Department of Health, "Guideline for Issuance of Fish Consumption Advisory Due to Contamination of Fish with Perfluorooctane Sulfonate."

39.     VDEQ performed the fish tissue sampling after it was alerted by Newport News Waterworks of elevated PFAS concentrations in the Middle Chickahominy River watershed, one of several sources of drinking water for Newport News, VA. *See* VDEQ, *Middle Chickahominy River PFAS Investigation*, available at https://perma.cc/CK9N-L49S.

40.     In response to the results of the sampling in the Middle Chickahominy watershed, Virginia officials recommended, in a December 9, 2022 guidance document titled "Provisional PFAS Screening Values for Surface Waters Designated as Public Water Supplies (PWS), Non-PWS Surface Waters, and Fish Tissue," that "sensitive populations (e.g., children and pregnant

13

women) avoid eating fish from the Middle Chickahominy River watershed until the United

States Environmental Protection Agency (EPA) finalizes recommendations to protect human

health from exposure through fish ingestion." VDEQ and VA Dept. of Health, Storymap: Middle

Chickahominy PFAS Study, October 15, 2022, https://perma.cc/9CLL-56SY.

     41.    In its comments on the draft Integrated Report, Wild Virginia explained that the

recommendation effectively constituted an admission that PFOS and other PFAS pollution is

interfering with important uses of the waterbodies, such as fish consumption and recreation, and

thus preventing compliance with Virginia's narrative water quality criteria and anti-degradation

policy, both of which require maintenance of designated and existing uses.

     42.    The Virginia Department of Health subsequently issued a PFOS fish consumption

advisory for the Middle Chickahominy River, limiting consumption of Chain Pickerel,

Largemouth Bass, and Sunfish to two meals per month, and for White Oak Swamp,

recommending no consumption of Creek Chubsucker, Chain Pickerel, and Sunfish. The advisory

is not limited to sensitive populations such as children. VDEQ, *Fish Consumption Advisory*,

https://perma.cc/RUG9-4HN4.

     43.    Wild Virginia's comments also highlighted a number of other waterbodies that

VDEQ's data showed significantly exceeded EPA's recommended drinking water standard for

PFOS, some by as much as an order of magnitude.

     44.    Wild Virginia noted that numerous other states—including Alabama, Maryland,

Minnesota, Michigan, and Wisconsin—had listed waterbodies as impaired based on high levels

of PFOS in fish and other PFAS data, and requested that VDEQ follow course so that the

corrective measures that flow from inclusion on the 303(d) List could begin to be implemented

and Virginia could address PFAS pollution in the state's waters as required by the CWA.

45.     On March 28, 2025, VDEQ submitted its final 303(d) List to EPA as part of the final "Virginia's 2024 305(b)/303(d) Water Quality Assessment Integrated Report" (the "Integrated Report," attached without its appendices as Exhibit 1), stating that only "minor revisions were made from the draft to the final version of the 2024 [Integrated Report]." March 28, 2025 Letter from Elizabeth McKercher, Director, VDEQ Water Planning Division, to Michelle Price-Fay, Director, EPA Region III Water Division. The Integrated Report purported to "provide[] the results of Virginia's water quality assessments for monitoring data collected in the six-year period between Jan. 1, 2017, through Dec. 31, 2022." Integrated Report at 1. Despite the voluminous data collected during that review period showing contamination of state waters with PFAS, VDEQ did not use that data to determine if any Virginia waters were impaired due to PFAS.

46.     The final Integrated Report did not assess whether the levels of PFOS contamination in the Middle Chickahominy River watershed were causing impairment, despite Virginia's recommendation against fish consumption (ultimately reflected in a fish consumption advisory) that effectively admitted the waters were not supporting their designated uses, nor did it provide a "technical, science-based rationale" for not doing so.

47.     Instead, the Integrated Report's references to PFAS are limited to Chapter 6, which describes Virginia's water quality programs. Section 6.6.7, entitled "Emerging Contaminants: Per- and Polyfluoroalkyl Substances (PFAS)," begins with a paragraph of background information on PFAS. Integrated Report at 269. Of the potential harm that PFAS pose, the IR states only that: "Some PFAS can accumulate in people and animals with repeated exposure, which may have adverse human health effects." *Id*.

48.     The Integrated Report then gives a timeline of efforts by DEQ and other agencies and localities to study the presence of PFAS in certain Virginia waters. It describes efforts since October 2021 to respond to "elevated PFAS concentrations in the Middle Chickahominy River watershed" by "identifying any potential risks to public health." *Id*. at 269–70.  It explains that "DEQ contracted with the United States Geological Survey (USGS) to complete a study of PFAS in the Middle Chickahominy River watershed. Fish tissue, sediment and surface water samples were collected at locations throughout the watershed, including in Chickahominy Lake, to understand the possible exposure pathways for human health." *Id*. at 270. Despite the narrative of efforts aimed at collecting data throughout the Middle Chickahominy River watershed, the Integrated Report does not discuss the results of those efforts or draw any conclusions as to whether any portion of the watershed is impaired for any designated uses.

49.     The Integrated Report then moves on to discussing a 2022 study investigating the presence of a different PFAS chemical, HFPO/GenX, which it states "was detected in the Roanoke River, Spring Hollow Reservoir, and associated drinking water supply that serves portions of Roanoke, Franklin, and Botetourt Counties. Fish tissue and surface water samples were collected at locations throughout the watershed, including in Spring Hollow Reservoir, to understand the possible exposure pathways for human health." *Id.* As with the Middle Chickahominy study, the Integrated Report does not discuss the results or draw any conclusions regarding impairment.

50.     Further, although this section also indicates that VDEQ has been monitoring surface waters for PFAS since 2021, such that some of that data was collected within the Integrated Report's 2017–22 review period, it does not discuss the levels of PFAS in the sampling data nor whether those levels indicate impairment. *Id.*

16

51.    The Integrated Report notes that, after the draft 2024 IR was published in April of 2024, further PFOS was detected in fish tissue collected from the Chickahominy River and White Oak Swamp, leading to the Virginia Department of Health's fish consumption advisory guideline for PFOS discussed above. In an apparent excuse for its failure to make an impairment determination, VDEQ in the Integrated Report stated that "[s]hould the VDH PFOS Guideline become effective, any resulting fish consumption advisories will be used to assess waters in subsequent Integrated Reports." *Id.* at 271. It also states that EPA's "draft recommended water quality criteria protective of human health for PFOA, PFOS, and PFBS . . . will not be considered for adoption in Virginia's Water Quality Standards regulation until they are finalized by EPA." *Id.* The Integrated Report does not, however, provide a technical, science-based rationale for why VDEQ could not make impairment determinations based on the voluminous data available to it—data which led other Virginia regulators to determine that fish consumption was unsafe as a result of PFOS contamination.

### EPA's Action (and Inaction) in Response to VDEQ's Submission

52.    EPA did not approve or disapprove VDEQ's submission within the 30-day period mandated by CWA section 303(d). Rather, EPA appears to have attempted to convince VDEQ to remedy its failure to provide a scientific rationale for not listing any waters as impaired by PFAS, particularly those waters in the Middle Chickahominy River watershed showing substantially elevated levels of PFOS in fish tissue.

53.    In an April 17, 2025 email to VDEQ, the Director of the Water Division for EPA Region III stated that "[i]t is my understanding that VDEQ didn't provide a scientific, technical justification for not using the data for the issue that we spoke about this morning," referencing the data for the Middle Chickahominy. EPA proposed that VDEQ "could withdraw and update

17

the rationale for the segment we were discussing and resubmit. . . . We would most likely act in

less than 30 days as we have already reviewed and only have question [sic] in one area.  This

would be focused on 'why this data does not support listing at this time' vs the delay in the [fish

consumption] advisory."

54.    VDEQ did not, however, withdraw and update any portion of the 2024 Integrated

Report nor otherwise cure its failure to provide a technical, science-based rationale for not

assessing or listing the Middle Chickahominy River watershed or any other of Virginia's waters

for which PFAS contamination data exists.

55.    On July 28, 2025, four months after VDEQ's initial submission and with no

further relevant submissions from VDEQ, EPA issued a letter approving Virginia's 2024 303(d)

list contained in the Integrated Report. Despite purporting to approve VDEQ's submission, EPA

qualified its action by stating that:

> While the EPA is approving all waterbody-pollutant combinations identified on
> Virginia's 2024 303(d) list, the EPA is taking no action, at this time, on water
> quality related information suggesting the presence of perfluorooctane sulfonic acid
> (PFOS) in fish tissue in certain segments in the Middle Chickahominy River
> watershed. Until such time as EPA takes action, those waterbody-pollutant
> combinations will remain in the same Integrated Report category consistent with
> Virginia's 2024 303(d) list as submitted.

July 28, 2025 Letter from Michelle Price-Fay, Director, EPA Region III Water Division, to

Elizabeth McKercher, Director, VDEQ Water Planning Division, at 1.

56.    EPA's letter was accompanied by an enclosure, titled "Rationale for EPA

Approval of Virginia's 2024 Clean Water Act Section 303(d) List" ("Rationale," attached as

Exhibit 2) in which EPA further explains that "[w]hile EPA is approving all waterbody-pollutant

combinations identified on Virginia's 2024 303(d) list, EPA is taking no action at this time on

18

water quality related information suggesting the presence of PFOS in fish tissue in certain

segments in the Middle Chickahominy River watershed." Rationale at 1.

57. The Rationale acknowledges EPA's duty arising under 40 CFR § 130.7(b)(6)(iii)

to determine whether a state has provided a "technical, science-based rationale for decisions not to

use data or information in developing" its 303(d) list. *Id.* at 2–3. EPA found that "Virginia

generally provided a rationale for not using the data it assembled and evaluated to develop its list"

but limited that conclusion to "the waters on which the EPA is taking action," i.e., those *other than*

the Middle Chickahominy River watershed. *Id.* at 3.

58. Regarding waters potentially impaired by PFAS, including the Middle

Chickahominy, EPA states that it:

> is taking no action at this time while the EPA continues to work with VADEQ in
> the near term to assess waters where samples suggest the presence of per- and
> polyfluoroalkyl substances (PFAS). Following publication of the draft 2024 303(d)
> list, VADEQ received public comment from Wild Virginia drawing attention to
> water quality-related information regarding certain fish tissue and ambient water
> chemistry data for perfluorooctane sulfonic acid (PFOS) in the Middle
> Chickahominy River watershed and urging that certain segments in that watershed
> be identified as [impaired] for PFOS on Virginia's 2024 303(d) list. The EPA
> received a similar letter from Wild Virginia following Virginia's submission of the
> final draft 2024 303(d) list pursuant to 33 U.S.C. § 1313(d)(2) and 40 C.F.R. §
> 130.7(d). The EPA's action pursuant to 33 U.S.C. § 1313(d)(2) on segments where
> there is water quality-related data suggesting the presence PFOS remains pending.
> A list of these segments is provided in Appendix B. Until such time as the EPA
> takes action, those waterbody-pollutant combinations will remain in the same
> Integrated Report category consistent with Virginia's 2024 303(d) list as submitted.

Rationale at 8. In an apparent attempt to pass off its present duties to a later date, EPA states that

it "anticipates that VADEQ will use the information it has collected to update its Assessment

Methodologies for its 2026 Section 303(d) list, including how it will evaluate data suggesting the

presence of PFAS." *Id.* The Rationale does not mention EPA's previous determination, delivered

in its email to VDEQ, that VDEQ would need to address its lack of technical, science-based

rationale for ignoring the PFAS data before EPA could approve its 303(d) List.

59.     Appendix B to the Rationale lists the segments for which EPA purports to "tak[e]

no action at this time":

## Enclosure 3
## Appendix B – List of Segments as to which EPA is taking no action at this time

| AUID | ASSESSMENT_UNIT_NAME | WATER_TYPE_NAME | WATER_SIZE | UNITS |
|---|---|---|---|---|
| VAP-G08E_CHK02A00 | Chickahominy River | ESTUARY | 5.468 | Square Miles |
| VAP-G08E_CHK01A00 | Chickahominy River | ESTUARY | 1.3726 | Square Miles |
| VAP-G07R_CHK01A00 | Chickahominy River | RIVER | 11.03 | Miles |
| VAP-G07L_CHK01A00 | Chickahominy Lake | RESERVOIR | 1050.47 | Acres |
| VAP-G06R_WOS01A98 | White Oak Swamp | RIVER | 6.69 | Miles |
| VAP-G06R_CHK03A02 | Chickahominy River | RIVER | 2.34 | Miles |
| VAP-G06R_CHK02A14 | Chickahominy River | RIVER | 11.78 | Miles |
| VAP-G06R_CHK01A98 | Chickahominy River | RIVER | 7.46 | Miles |

60.     Despite acknowledging that the PFOS contamination data available to VDEQ led

the Virginia Department of Health to issue a fish consumption advisory, Rationale at 8, EPA did

not disapprove Virginia's 303(d) List or promulgate its own list of impaired waters. EPA's

failure to disapprove Virginia's 303(d) List's that did not identify any waterbody segments as

impaired for PFAS prevented it from developing its own impairment list for Virginia, which

would lead to the development of TMDLs and other pollution reduction measures required for

the impaired waterbodies to comply with Virginia's water quality standards.

## FIRST CLAIM FOR RELIEF

**(Failure to Perform Mandatory Duties Triggered by VDEQ's Actual Submission
of a 303(d) List Lacking Identification of Streams Impaired by PFAS)**

61.     Wild Virginia realleges and incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth below.

62.     CWA Section 303(d) requires states to periodically develop and submit a list of waters within their borders that are not meeting water quality standards, including narrative criteria and antidegradation policies that mandate the protection of designated and existing uses such as recreation, fish consumption, and drinking water. 33 U.S.C. § 1313(d)(1)(a); 40 C.F.R. § 130.7(b)(3).

63.     In preparing their 303(d) Lists, states "shall assemble and evaluate all existing and readily available water quality-related data and information" and EPA is required to determine whether a state has provided a technical, science-based rationale for not using any such data. 40 C.F.R. § 130.7(b)(5).

64.     Once a state submits a 303(d) List to EPA, EPA must approve or disapprove the 303(d) List within 30 days. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). If EPA disapproves the state's 303(d) List, EPA must identify the impaired waters itself based on available data within 30 days of the disapproval. *Id.*

65.     In preparing the Commonwealth's 303(d) list, VDEQ failed to evaluate all available data to determine whether any of Virginia's waters were not meeting water quality standards, including Virginia's narrative criteria and antidegradation policy requiring the protection of designated and existing uses, as a result of PFAS pollution.

66.     VDEQ failed to utilize data showing that the Middle Chickahominy River watershed was failing to support designated uses as a result of PFOS pollution, as demonstrated by official state guidance and a later fish consumption advisory warning of the dangers posed by the high levels of the toxic chemical in fish tissue.

21

67.    VDEQ's submission constituted an affirmative determination, not supported by the record, that Virginia has no waters impaired by PFAS, despite abundant evidence to the contrary.

68.    When confronted with VDEQ's Integrated Report that failed to satisfy CWA section 303(d)'s requirements, EPA was required to disapprove of the submission and, within 30 days, develop its own list of the state's impaired waters, which list is to be used to develop Total Maximum Daily Loads that can allocate pollution reductions as necessary to satisfy water quality standards. 40 C.F.R. § 130.7(d)(2)

69.    Section 303(d) does not permit EPA to defer an approval decision while a state purportedly makes further efforts toward identifying impaired waters and developing TMDLs.

70.    VDEQ's submission of its 303(d) List as part of its 2024 Integrated Report triggered EPA's nondiscretionary duty to approve or disapprove all elements of the 303(d) List. Because VDEQ's submission did not assess waters for impairment based on PFAS pollution despite abundant available data and thus did not satisfy the requirements of CWA section 303(d) and its implementing regulations, EPA had and has a mandatory duty to disapprove Virginia's submission and develop its own, complete list of impaired waters.

71.    EPA's purported approval of Virginia's 303(d) list in VDEQ's Integrated Report wherein EPA declined to take action "on water quality related information suggesting the presence of perfluorooctane sulfonic acid (PFOS) in fish tissue in certain segments in the Middle Chickahominy River watershed" and other PFAS pollution data failed to satisfy EPA's nondiscretionary duties under Section 303(d)(2).

72.    CWA section 505(a)(2), 33 U.S.C. § 1365(a)(2), authorizes Wild Virginia to bring a civil action in this Court to compel EPA to perform its nondiscretionary duties.

## SECOND CLAIM FOR RELIEF

### (Agency Action That Is Arbitrary and Capricious or Not in Accordance With Law in Violation of the APA)

73.     Wild Virginia realleges and incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth below.

74.     CWA Section 303(d) requires states to periodically develop and submit a list of waters within their borders that are not meeting water quality standards, including narrative criteria and antidegradation policies that mandate the protection of designated and existing uses such as recreation, fish consumption, and drinking water. 33 U.S.C. § 1313(d)(1)(a); 40 C.F.R. § 130.7(b)(3).

75.     In preparing their 303(d) Lists, states "shall assemble and evaluate all existing and readily available water quality-related data and information" and EPA is required to determine whether a state has provided a technical, science-based rationale for not using any such data. 40 C.F.R. § 130.7(b)(5).

76.     Once a state submits a 303(d) List to EPA, EPA must approve or disapprove the 303(d) List within 30 days. 33 U.S.C. § 1313(d)(2). If EPA disapproves the state's 303(d) List, EPA must identify the impaired waters itself based on available data within 30 days of the disapproval. *Id.*

77.     In preparing the Commonwealth's 303(d) list, VDEQ failed to evaluate all available data to determine whether any of Virginia's waters were not meeting water quality standards, including Virginia's narrative criteria and antidegradation policy requiring the protection of designated and existing uses, as a result of PFAS pollution.

23

78.     EPA's approval of Virginia's 303(d) List—other than the stream segments upon which EPA purported to take no action—constituted final agency action on VDEQ's submittal that was arbitrary and capricious and not in accordance with law, and is reviewable under the APA. 5 U.S.C. §§ 702, 706(2)(A).

79.     As it failed to analyze numerous data for PFAS contamination across all Virginia waters, VDEQ similarly failed to utilize data showing that the Middle Chickahominy River watershed was failing to support designated uses as a result of PFOS pollution, as demonstrated by official state guidance and a later fish consumption advisory warning of the dangers posed by the high levels of the toxic chemical in fish tissue.

80.     To the extent that EPA's approval of Virginia's 303(d) list in VDEQ's Integrated Report, wherein EPA declined to take action "on water quality related information suggesting the presence of perfluorooctane sulfonic acid (PFOS) in fish tissue in certain segments in the Middle Chickahominy River watershed" and other PFAS pollution data, does not constitute a failure to satisfy a nondiscretionary duty actionable under the CWA citizen suit provision, 33 U.S.C. § 1365(a)2), EPA's approval of Virginia's 303(d) List, even though it failed to include PFAS-impaired segments of the Middle Chickahominy River, constituted final agency action on VDEQ's submittal that was arbitrary and capricious and not in accordance with law, and is reviewable under the APA. 5 U.S.C. §§ 702, 706(2)(A).

81.     EPA's approval of Virginia's Integrated Report is arbitrary and capricious and not in accordance with law, and thus must be vacated under the APA, because VDEQ's submission does not satisfy statutory and regulatory requirements to consider and act upon all available data, specifically data indicating impairment by PFOS and other PFAS. Further, EPA failed to rectify its approval of VDEQ's submission with the Direction of the Region III Water Division's prior

determination that "VDEQ didn't provide a scientific, technical justification for not using the [PFOS] data" such that the agency would need to "withdraw and update the rationale."

### **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this court enter an Order:

(1) Declaring that EPA has failed to perform its nondiscretionary duties under CWA section 303(d) and implementing regulations to disapprove Virginia's submission of a 303(d) List that failed to address toxic PFAS pollution and to promulgate its own, complete list of impaired waters for the Commonwealth;

(2) Declaring that EPA's approval of Virginia's 2024 303(d) list is arbitrary and capricious and not in accordance with law under the APA;

(3) Vacating EPA's approval of Virginia's 2024 303(d) list;

(4) Ordering EPA to perform its mandatory duties to disapprove Virginia's 303(d) List and develop its own list of impaired waters that reflects available data regarding PFAS pollution;

(5) Awarding Plaintiff's attorney fees and all other reasonable expenses incurred in pursuit of this action; and

(6) Granting other such relief as the Court deems just and proper.

Dated: December 19, 2025                                        Respectfully submitted,

                                                               /s/ Isak Howell
                                                               Isak Jordan Howell (VSB No. 75011)
                                                               Appalachian Mountain Advocates
                                                               P.O. Box 2186
                                                               Roanoke, VA 24009-2186
                                                               isak@howell-lawoffice.com
                                                               (540) 998-7744

CLAIRE HORAN
BENJAMIN A. LUCKETT
J. MICHAEL BECHER
DEREK O. TEANEY
APPALACHIAN MOUNTAIN
ADVOCATES
P.O. Box 403
Charlottesville, VA 22902
(907) 687-9561
choran@appalmad.org

*Counsel for Wild Virginia*

26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**AT RICHMOND**

**WILD VIRGINIA, INC.,**

        **Plaintiff,**

    **v.**                               **CIVIL ACTION NO. _____**

**UNITED STATED ENVIRONMENTAL**
**PROTECTION AGENCY; LEE ZELDIN,**
**in his official capacity as Administrator of**
**U.S. Environmental Protection Agency;**
**AMY VAN BLARCOM-LACKEY, in her**
**official capacity as Regional Administrator**
**for U.S. Environmental Protection Agency**
**Region III,**

        **Defendants.**

## CERTIFICATE OF SERVICE

    I, Isak Jordan Howell, do hereby certify that on December 19, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system.

                           /s/ Isak Howell
                           Isak Jordan Howell (VSB No. 75011)
                           Appalachian Mountain Advocates
                           P.O. Box 2186
                           Roanoke, VA 24009-2186
                           isak@howell-lawoffice.com
                           (540) 998-7744

                           *Attorney for Plaintiff*