**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND**

**WILD VIRGINIA, INC.,**

**Plaintiff,**

**v.**                                                                                      **CIVIL ACTION NO. 3:25-cv-1043**

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; LEE ZELDIN,
in his official capacity as Administrator of
U.S. Environmental Protection Agency;
AMY VAN BLARCOM-LACKEY, in her
official capacity as Regional Administrator
for U.S. Environmental Protection Agency
Region III,**

**Defendants.**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

In this civil action for declaratory judgment and mandatory injunctive relief, Plaintiff Wild

Virginia brings two claims against the United States Environmental Protection Agency ("EPA")

for violation of its duties under the Sections 303(d) and 305(b) of the Clean Water Act ("CWA"),

33 U.S.C. §§ 1201 *et seq.*, with respect to the list of impaired waterbodies submitted by Virginia

Department of Environmental Quality ("VDEQ") on March 28, 2025. Wild Virginia now seeks

summary judgment on the first claim: that EPA failed to perform its non-discretionary duty to

approve or deny Virginia's submission when it carved out a list of waterbody segments for which

it purported to take "no action."[1]

---

[1] The second claim for relief challenges Defendants' actions in response to VDEQ's submission as
arbitrary and capricious and not in accordance with law under the Administrative Procedure Act
("APA"), 5 U.S.C. §§ 701 *et seq.* This claim is not included in Plaintiff's motion for summary
judgment because it relies upon the administrative record, which has not yet been filed.

**LEGAL FRAMEWORK**

Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The goal of the CWA is to eliminate "the discharge of pollutants into the navigable waters," and, in the interim, to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." *Id.* §§ 1251(a)(1), (2).

To achieve those ends, Section 303 of the Act requires each state to establish and implement water quality standards, subject to review and approval by EPA. *Id.* §§ 1313(a)–(c), 1362(3). Water quality standards consist of, *inter alia*, the "designated uses" of a state's waters and "the water quality criteria for such waters based upon such uses," and shall be such as "to protect the public health or welfare, enhance the quality of water and serve the purposes of" the Act. *Id.* § 1313(c)(2)(A); 40 C.F.R. § 130.2(d). That is, a state's standards establish the maximum levels of pollution that a waterbody can withstand while still supporting a particular designated use, such as fishing, recreating, aquatic life support, or drinking water. As part of their water quality standards, States must also "develop and adopt a statewide antidegradation policy" that, among other things, ensures that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.'" 40 C.F.R. § 131.12. Water quality standards may include numeric criteria setting maximum pollutant concentrations as well as narrative criteria prohibiting conditions such as visible pollution (e.g., oily sheen or floating solids) or, more generally, prohibiting concentrations of pollutants that are harmful to human health or aquatic life. *Id.* § 130.7(b)(3).

Virginia has adopted water quality standards, including designated uses, numeric and narrative criteria, and an antidegradation policy. 9 Va. Admin. Code § 25-260-5 *et seq*. Virginia

2

regulations designate all state waters for the following uses: "recreational uses, e.g., swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; wildlife; and the production of edible and marketable natural resources, e.g., fish and shellfish." *Id.* § 25-260-10(A). VDEQ may designate state waters for "all reasonable public uses," including as a public water supply for drinking water. Va. Code § 62.1-44.2. In designating uses, it must "take into consideration the water quality standards of downstream waters and shall ensure that its water quality standards provide for the attainment and maintenance of the water quality standards of downstream waters." 9 Va. Admin. Code § 25-260-10(C); *see also* 40 C.F.R. 131.10(a) ("Each State must specify appropriate water uses to be achieved and protected. The classification of the waters of the State must take into consideration the use and value of water for public water supplies . . . .").

Per- and poly-fluoroalkyl substances ("PFAS") are pollutants under the CWA. *See* 33 U.S.C. § 1362(6) (including "chemical wastes" within the definition of "pollutant"); *see, e.g.*, *W. Va. Rivers Coalition, Inc. v. Chemours Co. FC, LLC*, 793 F. Supp. 3d 790, 798 (S.D.W. Va. 2025). Virginia does not have numeric water quality criteria for any PFAS. However, Virginia's narrative criteria state, in part, that:

> State waters, including wetlands, shall be free from substances attributable to sewage, industrial waste, or other waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life.
>
> Specific substances to be controlled include, but are not limited to . . . toxic substances (including those which bioaccumulate) . . . .

*Id.* § 25-260-20(A). Virginia's antidegradation policy states that, "[a]s a minimum, existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." *Id.* § 25-260-30(1).

CWA section 303(d) mandates that each state "shall identify those waters within its boundaries for which the [technology-based effluent limitations required for various industries by CWA section 301(b)] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(a). That is, a state is required to identify any waters that are not meeting water quality standards despite the implementation of effluent limits in discharge permits that are based on pollution control technologies. The "applicable" water quality standards "include[e] numeric criteria, narrative criteria, waterbody uses, and antidegradation requirements." 40 C.F.R. § 130.7(b)(3). Such lists must be submitted every two years. *Id.* § 130.7(d)(1). These lists are commonly referred to as "303(d) Lists."

In developing 303(d) Lists, states "are required to assemble and evaluate all existing and readily available water quality-related data and information, including for waters for which water quality problems have been reported by local, state, or federal agencies; members of the public; or academic institutions." U.S. EPA Office of Wetlands, Oceans, and Watersheds, "2024 Integrated Report Memorandum: Information Concerning 2024 Clean Water Act Sections 303(d), 305(b), and 314 Integrated Reporting and Listing Decisions," at 9 (citing 40 C.F.R. § 130.7(b)(5)). States "must use such data and information in developing the CWA 303(d) list unless they provide a rationale not to" and "EPA will evaluate whether a state, territory, or authorized tribe provides a technical, science-based rationale for decisions not to use data or information." *Id.*

EPA explains that "[i]t is important to note that the lack of an assessment methodology [for a particular type of pollutant or impairment] does not negate the requirement, in developing the

4

CWA 303(d) list, to assemble and evaluate all existing and readily available water quality-related data and information and use such data and information to determine if all applicable [water quality standards] (including numeric and narrative criteria) are attained (unless a rationale is provided for not using particular data and information)." *Id.* at 15.

Portions of waterbodies that are not meeting water quality standards despite application of technology-based controls are termed "water quality-limited segments," also known as "impaired waters," and are subject to a number of requirements designed to allow the waterbody to support applicable designated uses. 40 C.F.R. § 130.2(j). Those requirements include the development of total maximum daily loads (TMDLs). TMDLs establish the maximum quantity of a particular pollutant that the waterbody can receive per day while supporting designated uses—i.e.*,* the maximum load. They further impose wasteload allocations, which apportion the maximum load among dischargers to the waterbody through effluent limitations in individual permits to achieve the necessary reductions to the maximum load. *Id.* § 130.7. When a waterbody is not identified as impaired on a 303(d) List, that waterbody will not receive a TMDL and associated pollutant reductions necessary to allow the waterbody to satisfy water quality standards will not be mandated.

Once a state submits a 303(d) List to EPA, EPA must approve or disapprove the List within 30 days. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). EPA must also determine whether the state has provided a technical, science-based rationale for declining to use any available data to assess the impairment of its waters. 40 C.F.R. § 130.7(b)(5). If EPA disapproves the state's 303(d) List, EPA must identify the impaired waters itself—that is, develop its own, complete 303(d) List for the state—within 30 days of the disapproval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). If EPA develops its own 303(d) List, after a public comment period on that list or any revisions by

EPA to the state's proposed List, EPA must send the 303(d) List to the state, and the state must incorporate EPA's 303(d) List into its water quality management plan. 40 C.F.R. § 130.7(d)(2).

In addition to the requirements of section 303(d), CWA section 305(b) requires each state to provide a biennial report including "a description of the water quality of all navigable waters in such State" and "an analysis of the extent to which all navigable waters of such State provide for the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities in and on the water." 33 U.S.C. § 1315(b)(1)(A), (B). States, including Virginia, submit the report required by section 305(b) along with the 303(d) List in an Integrated Report. *See* 40 C.F.R. § 130.7(d)(1).

States are required to use the "water quality data and problems identified in the 305(b) report" to "develop water quality management (WQM) plan elements to help direct all subsequent control activities." 40 C.F.R. § 130.8(a). The water quality management plan constitutes the state's comprehensive goals and strategies for ensuring that its waters satisfy water quality standards. *See id.* §§ 130.2(k), 130.6. "Water quality problems identified in the 305(b) report should be analyzed through water quality management planning leading to the development of alternative controls and procedures for problems identified in the latest 305(b) report." *Id*. § 130.8(a); *see also id.* § 130.6(b) ("WQM plans draw upon the water quality assessments to identify priority point and nonpoint water quality problems, consider alternative solutions and recommend control measures, including the financial and institutional measures necessary for implementing recommended solutions. State annual work programs shall be based upon the priority issues identified in the State WQM plan."). Waters that are not listed in the 305(b) report would not be subject to WQM plan elements designed to address the problematic pollution. EPA must submit the 305(b) reports to

Congress along with an analysis thereof, and the reports and analyses are available to the public. 33 U.S.C. § 1315(b)(2).

**FACTS**

On March 28, 2025, VDEQ submitted its 303(d) List to EPA as part of its final "Virginia's 2024 305(b)/303(d) Water Quality Assessment Integrated Report" (the "Integrated Report," attached without its appendices to the Complaint as ECF No. 1-3). No Virginia waterbodies were listed as impaired for PFAS; instead, the Integrated Report's references to PFAS are limited to Chapter 6, which describes Virginia's water quality programs. Section 6.6.7, entitled "Emerging Contaminants: Per- and Polyfluoroalkyl Substances (PFAS)," begins with a paragraph of background information on PFAS. Integrated Report at 269. Of the potential harm that PFAS pose, the Integrated Report states only that: "Some PFAS can accumulate in people and animals with repeated exposure, which may have adverse human health effects." *Id*. The Integrated Report does not acknowledge that even low levels of PFAS exposure can be harmful to humans, or that the human health effects can be severe. In contrast, EPA has designated two of the most well-studied PFAS—perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA")—as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), in recognition that they are likely carcinogens for which there is no safe level of exposure. *See generally* 89 Fed. Reg. 39124 (May 8, 2024).

The Integrated Report gives a timeline of efforts by VDEQ and other agencies and localities to study the presence of PFAS in certain Virginia waters but makes no effort to evaluate existing data and makes no conclusions regarding impairment. It describes efforts since October 2021 to respond to "elevated PFAS concentrations in the Middle Chickahominy River watershed" by

"identifying any potential risks to public health." *Id*. at 269–70.  It explains that "DEQ contracted with the United States Geological Survey (USGS) to complete a study of PFAS in the Middle Chickahominy River watershed. Fish tissue, sediment and surface water samples were collected at locations throughout the watershed, including in Chickahominy Lake, to understand the possible exposure pathways for human health." *Id*. at 270. Despite the narrative of efforts aimed at collecting data throughout the Middle Chickahominy River watershed, the Integrated Report does not discuss the results of those efforts or draw any conclusions as to whether any portion of the watershed is impaired for any designated uses. Further, although this section also indicates that VDEQ has been monitoring surface waters for PFAS since 2021—such that some of that data was collected within the Integrated Report's 2017–22 review period—it does not discuss the levels of PFAS in the sampling data nor whether those levels indicate impairment. *Id.*

The Integrated Report additionally notes that, in April of 2024, PFOS present in fish collected from the Chickahominy River and White Oak Swamp, led to the Virginia Department of Health's issuance of a fish consumption advisory guideline for PFOS. *Id.* at 271. Instead of evaluating the implications of that advisory on the impairment status of those waters, VDEQ put off any such assessment until guidelines are finalized. *Id.* ("Should the VDH PFOS Guideline become effective, any resulting fish consumption advisories will be used to assess waters in subsequent Integrated Reports."). Similarly, while acknowledging EPA has promulgated draft recommended water criteria for PFAS pollutants, VDEQ stated that such criteria would not be considered until they were finalized by EPA and adopted in Virginia's Water Quality Standards. *Id.*

EPA did not approve or disapprove VDEQ's submission within the 30-day period mandated by CWA section 303(d). On July 28, 2025, four months after VDEQ submitted the final 303(d)

List within the Integrated Report, EPA issued a letter approving Virginia's 2024 303(d) List. ECF No. 1-4 (July 28, 2025 Letter from Michelle Price-Fay, Director, EPA Region III Water Division, to Elizabeth McKercher, Director, VDEQ Water Planning Division). Despite purporting to approve VDEQ's submission, EPA qualified its action by stating that:

> While the EPA is approving all waterbody-pollutant combinations identified on Virginia's 2024 303(d) list, the EPA is taking no action, at this time, on water quality related information suggesting the presence of perfluorooctane sulfonic acid (PFOS) in fish tissue in certain segments in the Middle Chickahominy River watershed. Until such time as EPA takes action, those waterbody-pollutant combinations will remain in the same Integrated Report category consistent with Virginia's 2024 303(d) list as submitted.

*Id.* at 1.  EPA's letter was accompanied by an enclosure, titled "Rationale for EPA Approval of Virginia's 2024 Clean Water Act Section 303(d) List" ("Rationale," *id.* at 3–22), in which EPA further explains that "[w]hile EPA is approving all waterbody-pollutant combinations identified on Virginia's 2024 303(d) list, EPA is taking no action at this time on water quality related information suggesting the presence of PFOS in fish tissue in certain segments in the Middle Chickahominy River watershed." *Id.* at 3. Appendix B to the Rationale lists the segments for which EPA purports to "tak[e] no action at this time":

### Enclosure 3
### Appendix B – List of Segments as to which EPA is taking no action at this time

| AUID | ASSESSMENT_UNIT_NAME | WATER_TYPE_NAME | WATER_SIZE | UNITS |
|---|---|---|---|---|
| VAP-G08E_CHK02A00 | Chickahominy River | ESTUARY | 5.468 | Square Miles |
| VAP-G08E_CHK01A00 | Chickahominy River | ESTUARY | 1.3726 | Square Miles |
| VAP-G07R_CHK01A00 | Chickahominy River | RIVER | 11.03 | Miles |
| VAP-G07L_CHK01A00 | Chickahominy Lake | RESERVOIR | 1050.47 | Acres |
| VAP-G06R_WOS01A98 | White Oak Swamp | RIVER | 6.69 | Miles |
| VAP-G06R_CHK03A02 | Chickahominy River | RIVER | 2.34 | Miles |
| VAP-G06R_CHK02A14 | Chickahominy River | RIVER | 11.78 | Miles |
| VAP-G06R_CHK01A98 | Chickahominy River | RIVER | 7.46 | Miles |

The Rationale acknowledges EPA's duty arising under 40 CFR § 130.7(b)(6)(iii) to determine whether a state has provided a "technical, science-based rationale for decisions not to use data or information in developing" its 303(d) list. *Id.* at 5–6. EPA found that "Virginia generally provided a rationale for not using the data it assembled and evaluated to develop its list" but limited that conclusion to "the waters on which the EPA is taking action," i.e., those *other than* the excluded segments of the Middle Chickahominy River watershed. *Id.* at 6. Nowhere does EPA purport to make the required determination on the excluded segments.

Regarding waters potentially impaired by PFAS, including the Middle Chickahominy segments, EPA states that it:

> is taking no action at this time while the EPA continues to work with VADEQ in the near term to assess waters where samples suggest the presence of per- and polyfluoroalkyl substances (PFAS). Following publication of the draft 2024 303(d) list, VADEQ received public comment from Wild Virginia drawing attention to water quality-related information regarding certain fish tissue and ambient water chemistry data for perfluorooctane sulfonic acid (PFOS) in the Middle Chickahominy River watershed and urging that certain segments in that watershed be identified as [impaired] for PFOS on Virginia's 2024 303(d) list. The EPA received a similar letter from Wild Virginia following Virginia's submission of the final draft 2024 303(d) list pursuant to 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.7(d). The EPA's action pursuant to 33 U.S.C. § 1313(d)(2) on segments where there is water quality-related data suggesting the presence PFOS remains pending. A list of these segments is provided in Appendix B. Until such time as the EPA takes action, those waterbody-pollutant combinations will remain in the same Integrated Report category consistent with Virginia's 2024 303(d) list as submitted.

*Id.* at 11. The Rationale further states that EPA "anticipates that VADEQ will use the information it has collected to update its Assessment Methodologies for its 2026 Section 303(d) list, including how it will evaluate data suggesting the presence of PFAS." *Id.* Missing from EPA's letter and Rationale is any approval or disapproval of VDEQ's decision not to list those potentially impaired waters.

10

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## ARGUMENT

### I. Wild Virginia Has Standing to Challenge EPA's Lack of Action on the Chickahominy Waterbody Segments.

CWA Section 505(a)(2) authorizes any "citizen" to commence a civil action "against the [EPA] Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator," and provides the district courts with jurisdiction to "order the Administrator to perform such act or duty." 33 U.S.C. § 1365(a)(2). Citizen means "a person or persons having an interest which is or may be adversely affected," *id.* § 1365(g), and "person" means "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body," *id.* § 1362(5). As Wild Virginia is a "citizen" within the meaning of Section 505(a)(2) challenging EPA's failure to perform a duty mandated by the CWA, Wild Virginia has standing if it satisfies Article III of the United States Constitution.

To have standing under Article III of the Constitution's "case or controversy requirement," a plaintiff must suffer an actual or threatened injury-in-fact that is fairly traceable to the challenged action and is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167, 180–81 (2000). An organization has representational standing when (1) at least one of its members would have standing to sue in his or her own right, (2) the organization's purpose is germane to the interests it seeks to protect, and (3) there is no

11

need for the direct participation of the individual members in the action. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000). Under those principles, Wild Virginia relies on one of its members, Rob Whitehead, to establish standing with respect to the Complaint's First Claim for Relief. *See* Ex. 1, Whitehead Decl.

Environmental organizations satisfy constitutional standing requirements when they have at least one member who has suffered an injury to his or her aesthetic, health, environmental, or recreational interests. *See, e.g.*, *Friends of the Earth*, 204 F.3d at 154. A threatened injury is sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Mr. Whitehead is a member of Wild Virginia, Ex. 1, ¶ 2, whose aesthetic, health, environmental, and recreational interests have been injured or threatened by EPA's refusal to approve or disapprove Virginia's omission of Middle Chickahominy watershed segments from its 303(d) List.

Mr. Whitehead has been fishing, kayaking, and swimming in the Chickahominy River and other waters throughout Virginia for over 25 years. *Id.* ¶ 4. Although he and his partner and son often eat the fish he catches, he fishes less and eats the fish less often in areas he believes to be contaminated with PFAS because he understands that consuming PFAS-contaminated fish and other exposures to PFAS can cause health problems. *Id.* ¶ 7. Now that the Virginia Department of Health has issued a fish consumption advisory for PFOS in the Chickahominy River, Mr. Whitehead and his family do not eat fish he catches from the Chickahominy River. *Id.* ¶ 8. He will not resume eating it until there are no longer high levels of PFOS or other PFAS there. *Id.* Mr. Whitehead would keep and eat more fish from the Chickahominy River and the James River (into which the Chickahominy River flows) if he knew that the fish were safe to eat. *Id.* ¶ 9. He would be more likely to eat fish that he catches if either the PFAS pollution was better controlled or if he knew which waterbodies are impaired for PFAS and which are not. *Id.* Mr. Whitehead also enjoys

12

swimming when he is out fishing on hot days, but he will not get in the water in areas he believes to be contaminated with PFAS, including the Chickahominy River, because of the risk of accidentally ingesting river water. *Id.* ¶ 10.

Mr. Whitehead is suffering injury to his judicially protectable interests as a result of EPA's lack of action on Chickahominy River segments in which he regularly fishes. EPA's refusal to act on these segments prolongs the time in which they will go without protections, preventing Mr. Whitehead from enjoying these areas of the Chickahominy River and eating the fish as he used to. These injuries would be redressed by a favorable ruling in this case because, if EPA is ordered to act with respect to these segments by disapproving Virginia's 303(d) List and including the segments on its own List, that would trigger increased regulatory efforts to protect these segments, leading to reductions in PFAS levels. Mr. Whitehead would then be able to consume the fish that he catches from the Chickahominy River. *Id.* ¶¶ 9, 10, 12. He would also enjoy his time on the water more because he would be able to swim on hot days and worry less about potential exposure to PFAS. *Id.* ¶ 12. A more accurate list would also allow him to be confident that waters not included on the List are safe, so that eating fish from or swimming in unlisted waters would not expose him or his family to dangerous levels of PFAS. *Id.*

## II. EPA Failed to Act With Respect to Virginia's Entire 303(d) List, as Required by the CWA.

Wild Virginia now moves for summary judgment on the Complaint's First Claim for Relief: EPA's failure to act with respect to Virginia's entire 303(d) List. This Claim is very simple: (1) EPA itself stated in its letter approving Virginia's 303(d) List that it was not taking action with respect to the waterbody segments listed in Enclosure 3, Appendix B attached to its letter, *id.* at 23; and

(2) EPA had no authority to carve out any Virginia waters from its approval or disapproval of Virginia's 303(d) List, which it was required to issue within 30 days of Virginia's submission.

EPA's July 28, 2025 letter approving Virginia's 2024 303(d) list—issued four months after VDEQ submitted the List—states: "While the EPA is approving all waterbody-pollutant combinations identified on Virginia's 2024 303(d) list, the EPA is taking no action, at this time, on water quality related information suggesting the presence of perfluorooctane sulfonic acid (PFOS) in fish tissue in certain segments in the Middle Chickahominy River watershed." *Id.* at 1. These segments include parts of the Middle Chickahominy River, Chickahominy Lake, and White Oak Swamp.

EPA's Rationale explains that "Virginia generally provided a rationale for not using the data it assembled and evaluated to develop its list" but limited that conclusion to "the waters on which the EPA is taking action." *Id.* at 6. That is, EPA did not conclude that Virginia had provided a rationale for disregarding the data showing PFAS contamination in the excluded segments of the Middle Chickahominy River watershed. Regarding waters potentially impaired by PFAS, including the Middle Chickahominy segments, EPA further explains what it means by purporting to "tak[e] no action":

> The EPA is taking no action at this time while the EPA continues to work with VADEQ in the near term to assess waters where samples suggest the presence of per- and polyfluoroalkyl substances (PFAS). Following publication of the draft 2024 303(d) list, VADEQ received public comment from Wild Virginia drawing attention to water quality-related information regarding certain fish tissue and ambient water chemistry data for perfluorooctane sulfonic acid (PFOS) in the Middle Chickahominy River watershed and urging that certain segments in that watershed be identified as [impaired] for PFOS on Virginia's 2024 303(d) list. The EPA received a similar letter from Wild Virginia following Virginia's submission of the final draft 2024 303(d) list pursuant to 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.7(d). The EPA's action pursuant to 33 U.S.C. § 1313(d)(2) on segments where there is water quality-related data suggesting the presence [of] PFOS remains pending.

14

*Id.* at 11. The Rationale further states that EPA "anticipates that VADEQ will use the information it has collected to update its Assessment Methodologies for its 2026 Section 303(d) list, including how it will evaluate data suggesting the presence of PFAS." *Id.* This reference to the 2026 List indicates that EPA does not plan to "take action" on the carved-out waterbody segments until Virginia submits its next 303(d) List, but, even if EPA had plans to act sooner, it has violated the CWA's requirement that it take action on Lists within 30 days of submission. *See* 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). Nothing in Section 303(d) or its implementing regulations permits EPA to defer an approval decision while a state purportedly makes further efforts.

VDEQ's submission of its 303(d) List as part of its 2024 Integrated Report triggered EPA's nondiscretionary duty to approve or disapprove all elements of the 303(d) List. EPA's purported approval of Virginia's 303(d) list in VDEQ's Integrated Report wherein EPA declined to take action failed to satisfy EPA's nondiscretionary duties under Section 303(d)(2). EPA has no authority to decline to take action with respect to some parts of a State's 303(d) List or some waterbody segments within a state, and Wild Virginia is entitled to judgment as a matter of law. *See Am. Canoe Ass'n, Inc. v. EPA*, 30 F. Supp. 2d 908, 918 (E.D. Va. 1998) (noting that Section 303(d) "requires that a decision be made" by the EPA Administrator whether to approve or disapprove a state's submissions and that this non-discretionary duty is reviewable under the citizen suit provision of the CWA).

CWA Section 303(d) requires states to periodically develop and submit a list of waters within their borders that are not meeting water quality standards. 33 U.S.C. § 1313(d)(1)(a); 40 C.F.R. § 130.7(b)(3). Once a state submits a 303(d) List to EPA, EPA must approve or disapprove the 303(d) List within 30 days. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). If EPA disapproves the state's 303(d) List, EPA must identify the impaired waters itself based on available data within

15

30 days of the disapproval. *Id.* VDEQ's submission constituted an affirmative determination that Virginia has no waters impaired by PFAS, and EPA was required to evaluate that determination and, if EPA found it to be untrue, to identify which Virginia waterbody segments are impaired for PFAS.

EPA had no authority to leave some waterbody segments out of its evaluation, as Section 303(d) includes only the options to approve or disapprove a List. *See Am. Canoe Ass'n, Inc.*, 30 F. Supp. 2d at 918. Taking "no action" on a part of its required determination is not an option. Nor is it logically possible. EPA's carveout of some waterbody segments for "no action" renders its approval of the rest of Virginia's List meaningless. As the Fourth Circuit has put it, "Section 303(d) of the [CWA] requires a state to place its impaired waters on a list ("the 303(d) List") and to establish a priority ranking of the impaired waters, accounting for the severity of the pollution." *Ohio Valley Env't Coalition, Inc. v. Pruitt*, 893 F.3d 225, 227 (4th Cir. 2018). As the court explained in *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210 (D.D.C. 2011), states are required to include on the List *all waters* for which *any water quality standards* are not being attained:

> Every two years, a State must submit to EPA a list of waters that do not currently attain, and based on current pollution controls are not expected to attain, applicable water quality standards. 40 C.F.R. § 130.7(b)(3) & (d). Under governing regulations, this submission—known as a "303(d) list"—contains *216 all waters for which (1) technology-based effluent limitations, (2) more stringent effluent limitations imposed by State or local authority, and (3) other pollution controls required by State law are "not stringent enough to implement *any water quality standards* applicable to such waters." Id. § 130.7(b)(1).

798 F. Supp. 2d at 215–16 (emphasis added). EPA's approval of a state's 303(d) List necessarily means that it agrees with the State's selection of waters it has identified as impaired. It is not logically possible for EPA to approve a list as containing the complete set of impaired waters and at the same time refrain from deciding whether certain waters belong on that list. Approval of a

16

303(d) List means the EPA deems the List complete. Disapproval means the List, in EPA's judgment, does not contain a complete and accurate selection of the impaired waters, which triggers the requirement for EPA to identify the complete and accurate selection. There is simply no room for EPA to reserve judgment on whether certain waterbody segments are impaired.

In preparing their 303(d) Lists, states are required to use "all existing and readily available water quality-related data and information," and EPA is required to determine whether a state has provided a technical, science-based rationale for not using any such data. 40 C.F.R. § 130.7(b)(5). As explained above, EPA declined to make that determination with respect to the carved-out waterbody segments "where there is water quality-related data suggesting the presence [of] PFOS." ECF No. 1-4 at 11.

Thus, it appears that EPA declined to take action on these segments because VDEQ lacked a science-based rationale for failing to include them on its 303(d) List. But, if EPA determined that VDEQ's Integrated Report failed to satisfy CWA section 303(d)'s requirements by failing to include waterbody segments impaired for PFOS, EPA was required to disapprove of the submission and, within 30 days, develop its own list of Virginia's impaired waters, so that the List could be used immediately to inform Virginia's regulatory efforts. These efforts would include developing Total Maximum Daily Loads that can allocate pollution reductions as necessary to satisfy water quality standards. 40 C.F.R. § 130.7(d)(2).

EPA's stated reason for excluding the Chickahominy watershed segments illustrates why allowing such exceptions to the requirement for action within 30 days would swallow the rule. When faced with a state's List that fails to include all impaired waters, EPA must disapprove the List and create its own List with all impaired waters identified. EPA could completely shirk its duty to identify impaired waters that a state had missed by carving out such waters for "no action"

17

while approving the List, and that is what it appears has happened here. Such a practice, if sanctioned by courts, would allow the EPA to avoid its duty to identify impaired waters within thirty days when a state fails to do so. That requirement could always be avoided and would, as a result, be nullified in practice.

To be clear, Plaintiff's Motion does not require the Court to decide why EPA declined to take action or whether EPA could have approved Virginia's 303(d) List in its entirety without acting arbitrarily and capriciously. It suffices for the Motion for Partial Summary Judgment that EPA declined to take action on certain waterbody segments and that EPA does not have authority to reserve action on parts of a State's 303(d) List or on some waterbody segments within a state.[2]

## CONCLUSION

As there is no genuine dispute of material fact over whether EPA failed to take action on its non-discretionary duty to approve or deny Virginia's 303(d) list in its entirety and Wild Virginia is entitled to judgment as a matter of law, Wild Virginia respectfully requests that the Court grant its motion for partial summary judgment on its First Claim for Relief.

---

[2] EPA's decision not to disapprove Virginia's 303(d) List was arbitrary and capricious under the APA, as alleged in the Complaint's Second Claim for Relief and as will be demonstrated by the administrative record. The presence of PFOS in concentrations sufficient to trigger the Virginia Department of Heath's fish consumption advisory shows that Virginia waters are not meeting their designated uses. 9 Va. Admin. Code § 25-260-10(A) (designating all waters for "recreational uses, e.g., swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish . . . and the production of edible and marketable natural resources, e.g., fish and shellfish."). Despite acknowledging the PFOS contamination data and the fish consumption advisory, ECF. No 1-4 at 11, EPA did not disapprove Virginia's 303(d) List or promulgate its own list of impaired waters. EPA's failure to disapprove Virginia's 303(d) List— which did not identify any waterbody segments as impaired for PFAS—prevented it from developing its own impairment list for Virginia, which would lead to the development of TMDLs and other pollution reduction measures to bring those waterbodies into compliance with Virginia's water quality standards.

Dated: April 15, 2026

Respectfully submitted,

s/ *Claire Horan*

Claire Marie Horan (VSB No. 95386)
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 403
Charlottesville, Virginia 22902
choran@appalmad.org
(907) 687-8561

Isak Jordan Howell (VSB No. 75011)
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 2186
Roanoke, Virginia 24009-2186
isak@howell-lawoffice.com
(540) 998-7744

*Counsel for Wild Virginia*

19

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

**WILD VIRGINIA, INC.,**

        **Plaintiff,**

        **v.**                                  **CIVIL ACTION NO. 3:25-cv-1043**

**UNITED STATED ENVIRONMENTAL
PROTECTION AGENCY; LEE ZELDIN,
in his official capacity as Administrator of
U.S. Environmental Protection Agency;
AMY VAN BLARCOM-LACKEY, in her
official capacity as Regional Administrator
for U.S. Environmental Protection Agency
Region III,**

        **Defendants.**

## CERTIFICATE OF SERVICE

I, Claire Horan, do hereby certify that on April 15, 2026, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF filing system.

s/ *Claire Horan*                    
Claire Marie Horan (VSB No. 95386)
Appalachian Mountain Advocates
P.O. Box 403
Charlottesville, Virginia 22902
choran@appalmad.org
(907) 687-8561

*Counsel for Wild Virginia*

20