IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

**WILD VIRGINIA, INC.,**

**Plaintiff,**

**v.**

CIVIL ACTION NO. 3:25-cv-1043

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; LEE ZELDIN,
in his official capacity as Administrator of
U.S. Environmental Protection Agency;
AMY VAN BLARCOM-LACKEY, in her
official capacity as Regional Administrator
for U.S. Environmental Protection Agency
Region III,**

**Defendants.**

## FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      In this civil action for declaratory judgment and mandatory injunctive relief, Plaintiff Wild Virginia challenges the United Stated Environmental Protection Agency's ("EPA") approval of Virginia Department of Environmental Quality's ("VDEQ") list of the Commonwealth's impaired streams, submitted pursuant to requirements under sections 303(d) and 305(b) of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1201 *et seq*., known as a "303(d) List." Plaintiff challenges Defendants' approval of VDEQ's submission as arbitrary and capricious and not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

2.      As detailed below, Wild Virginia alleges that VDEQ's list of "impaired" waterbodies, i.e., those waters that fail to satisfy water quality standards, included in its 2024 305(b)/303(d) Water Quality Assessment Integrated Report"("Integrated Report") fails to satisfy

CWA sections 303(d) and 305(b) because it fails to identify any waters as impaired by per- and polyfluoroalkyl substances ("PFAS") despite abundant evidence in VDEQ's possession showing that many waters in the state are contaminated by the toxic chemicals such that the waters cannot support their designated uses under the CWA, including but not limited to certain waters for which the Commonwealth has issued a fish consumption advisory due to high PFAS levels found in fish tissue.

3.       PFAS are a large and diverse structural family of compounds used in a myriad of commercial applications due to their unique properties, such as resistance to high and low temperatures, resistance to degradation, and nonstick characteristics. "PFAS tend to break down slowly and persist in the environment, and consequently, they can accumulate in the environment . . . over time." U.S. EPA, *PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32,532, 32,532 (April 26, 2024). That property has led PFAS to be "known as forever chemicals." *See Ctr. for Envtl. Health v. Regan*, 103 F.4th 1027, 1031 (4th Cir. 2024).

4.       PFAS are toxic to human health. 89 Fed. Reg. at 32,544. Research has shown that exposure to PFAS is linked to cancer, liver damage, birth defects, and other health problems. *See id.* at 32,537 ("The adverse health effects associated with exposure to such PFAS include (but are not limited to): effects on the liver (e.g., liver cell death), growth and development (e.g., low birth weight), hormone levels, kidney, the immune system (reduced response to vaccines), lipid levels (e.g., high cholesterol), the nervous system, and reproduction, as well as increased risk of certain types of cancer."). EPA "reviewed the weight of the evidence" and determined that two specific PFAS—perfluorooctanoic acid (PFOA) and perfluorooctane sulfonic acid (PFOS)—"are likely to be carcinogenic to humans." U.S. EPA, *EPA Efforts to Reduce Exposure to Carcinogens and Prevent Cancer*. EPA's drinking water standards set Maximum Contaminant

Level Goals (MCLGs) for PFOS and PFOA at zero, which "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts." U.S. EPA, presentation: *Final PFAS National Primary Drinking Water Regulation.*

5.    When faced with VDEQ's inadequate Integrated Report that failed to address the abundant available data regarding PFAS pollution, EPA was required to disapprove the state's submission and develop its own list of waters in Virginia that do not satisfy water quality standards. EPA's failure to correct VDEQ's error leaves numerous waterbodies that are burdened with harmful levels of PFAS pollution unprotected from the remedial measures that would be required to bring those waters into compliance with water quality standards were they included in the Integrated Report, and frustrates efforts to inform the public of the widespread and potentially harmful levels of PFAS pollution in Virginia's waters.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 (Administrative Procedure Act); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); and 28 U.S.C. §§ 2201–02 (power to issue declaratory judgments in cases of actual controversy).

7.

8.    Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occur in this District.

## PARTIES

9.      Plaintiff Wild Virginia is a 501(c)(3) nonprofit organization working to preserve and support the complexity, diversity, and stability of natural ecosystems by enhancing connectivity, water quality, and climate in the forests, mountains, and waters of Virginia. Wild Virginia has worked consistently to hold the government and regulators accountable for their duties to protect Virginia's land and people from the harms of PFAS and other threats.

10.      Wild Virginia is a "person" "adversely affected or aggrieved by agency action" under the APA's right of review provision. 5 U.S.C. §702.

11.      Wild Virginia's members suffer injuries to their aesthetic, recreational, environmental, and/or economic interests as a result of Defendants' arbitrary action approving Virginia's inadequate Integrated Report. Plaintiff's members fish, swim, observe wildlife, or otherwise use waters that are affected by PFAS pollution and that would benefit from the agency making an impairment determination. Members would benefit from the listing itself, as it would help them avoid or limit their uses of PFAS-impaired waters, and they would also benefit from any resulting measures to improve water quality in order to achieve water quality standards. Plaintiff's members' use and enjoyment of those waters are diminished and curtailed because of Defendants' failure to act and its unlawful actions.

12.      For example, Rob Whitehead is a member of Wild Virginia who has been fishing, kayaking, and swimming in the Chickahominy River and other waters throughout Virginia for over 25 years. Although he and his wife and son often eat the fish he catches, he fishes less and eats the fish less often in areas he believes to be contaminated with PFAS. Mr. Whitehead enjoys swimming when he is out fishing on hot days, but he will not get in the water in areas he believes to be contaminated with PFAS. He is also concerned about his drinking water, as it is sourced from the James River, which he believes may be contaminated with PFAS.

13. Nancy Armour, another member of Wild Virginia, has a waterfront property on the Potomac River in Montross, Virginia, where she enjoys recreating on the River most weekends with her family. She and her family have eaten fish and seafood from the Potomac for about 20 years, but they now limit the amount they eat due to their concerns about PFAS-contaminated foods impacting their long-term health. Ms. Armour is also concerned about the drinking water at her family's other home in Woodbridge, Virginia. That drinking water is sourced from the Occoquan Reservoir, which Ms. Armour believes may be contaminated with PFAS.

14. Defendant United States Environmental Protection Agency ("EPA") is the federal agency responsible for implementing and overseeing the States' implementation of the Clean Water Act. Specifically, EPA is the agency responsible for approving or disapproving state reports of their waterbodies' compliance with water quality standards under CWA sections 303(d) and 305(b), and for promulgating adequate reports where states fail to do so.

15. Defendant Lee Zeldin is the Administrator of EPA and is sued in his official capacity. The Administrator has ultimate authority for EPA's actions and inactions.

16. Defendant Amy Van Blarcom-Lackey is the Regional Administrator for EPA Region III, which includes Virginia, and is sued in her official capacity. Pursuant to 40 C.F.R. § 130.7(d)(2), the Administrator has delegated his relevant authorities and nondiscretionary duties under CWA section 303 to the Regional Administrators.

## STATUTORY AND REGULATORY BACKGROUND

### Water Quality Standards

17. Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The goal of the

CWA is to eliminate "the discharge of pollutants into the navigable waters," and, in the interim, to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. §§ 1251(a)(1), (2).

18.     To achieve those ends, Section 303 of the Act requires each State to establish and implement water quality standards, subject to review and approval by EPA. 33 U.S.C. §§ 1313(a)–(c), 1362(3). Water quality standards consist of, *inter alia*, the "designated uses" of a State's waters and "the water quality criteria for such waters based upon such uses," and shall be such as "to protect the public health or welfare, enhance the quality of water and serve the purposes of" the Act. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 130.2(d). That is, the States' standards establish the maximum levels of pollution that a waterbody can withstand while still supporting a particular designated use such as fishing, "contact recreation," i.e., swimming and wading, aquatic life support, or drinking water.

19.     As part of their water quality standards, States must also "develop and adopt a statewide antidegradation policy" that, among other things, ensures that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.'" 40 C.F.R. § 131.12.

20.     Water quality standards may include numeric criteria setting maximum pollutant concentrations as well as narrative criteria prohibiting conditions such as visible pollution (e.g., oily sheen or floating solids) or, more generally, prohibiting concentrations of pollutants that are harmful to human health or aquatic life. 40 C.F.R. § 130.7(b)(3).

21.     Virginia has adopted water quality standards, including designated uses, numeric and narrative criteria, and an antidegradation policy. 9 Va. Admin. Code § 25-260-5 *et seq*. Virginia regulations designate all state waters for the following uses: "recreational uses, e.g.,

6

swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; wildlife; and the production of edible and marketable natural resources, e.g., fish and shellfish." *Id.* § 25-260-10(A).

22.    Virginia does not have numeric water quality criteria for any PFAS. However, Virginia's narrative criteria state, in part, that:

> State waters, including wetlands, shall be free from substances attributable to sewage, industrial waste, or other waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life.
>
> Specific substances to be controlled include, but are not limited to. . . toxic substances (including those which bioaccumulate) . . . .

*Id.* § 25-260-20(A).

23.    Virginia's antidegradation policy states that, "[a]s a minimum, existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." *Id.* § 25-260-30(1).

## State Submission of Water Quality Reports to EPA

24.    CWA section 303(d) mandates that each state "shall identify those waters within its boundaries for which the [technology-based effluent limitations required for various industries by CWA section 301(b)] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(a). That is, the state is required to identify any waters that are not meeting water quality standards despite the implementation of effluent limits in discharge permits that are based on pollution control technologies . The "applicable" water quality standards "include[e] numeric criteria, narrative criteria, waterbody

7

uses, and antidegradation requirements." 40 C.F.R. § 130.7(b)(3). Such lists must be submitted every two years. *Id.* § 130.7(d)(1).  These lists are commonly referred to as "303(d) Lists."

25.    In developing 303(d) Lists, States "are required to assemble and evaluate all existing and readily available water quality-related data and information, including for waters for which water quality problems have been reported by local, state, or federal agencies; members of the public; or academic institutions." U.S. EPA Office of Wetlands, Oceans, and Watersheds, "2024 Integrated Report Memorandum: Information Concerning 2024 Clean Water Act Sections 303(d), 305(b), and 314 Integrated Reporting and Listing Decisions," at 9 (citing 40 C.F.R. § 130.7(b)(5)). States "must use such data and information in developing the CWA 303(d) list unless they provide a rationale not to" and "EPA will evaluate whether a state, territory, or authorized tribe provides a technical, science-based rationale for decisions not to use data or information." *Id.*

26.    EPA explains that "[i]t is important to note that the lack of an assessment methodology [for a particular type of pollutant or impairment] does not negate the requirement, in developing the CWA 303(d) list, to assemble and evaluate all existing and readily available water quality-related data and information and use such data and information to determine if all applicable [water quality standards] (including numeric and narrative criteria) are attained (unless a rationale is provided for not using particular data and information)." *Id.* at 15.

27.    Portions of waterbodies that are not meeting water quality standards despite application of technology-based controls are termed "water quality-limited segments," also known as "impaired waters," and are subject to a number of requirements designed to allow the waterbody to support applicable designated uses. 40 C.F.R. § 130.2(j). Those requirements include the development of total maximum daily loads (TMDLs). TMDLs establish the

maximum quantity of a particular pollutant that the waterbody can receive per day while supporting designated uses—i.e., the maximum load. They further impose wasteload allocations, which apportion the maximum load among dischargers to the waterbody through effluent limitations in individual permits to achieve the necessary reductions to the maximum load. *Id.* § 130.7. Where a state fails to identify a waterbody as impaired, that waterbody will not receive a TMDL and associated pollutant reductions necessary to allow the waterbody to satisfy water quality standards will not be mandated.

28.    Once a state submits a 303(d) List to EPA, EPA must approve or disapprove the list within 30 days. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). EPA's decision requires it to determine whether the state has provided a technical, science-based rationale for declining to use any available data to assess the impairment of its waters. 40 C.F.R. § 130.7(b)(5). If EPA disapproves the state's 303(d) List, EPA must identify the impaired waters itself—that is, develop its own, complete 303(d) List for the state—within 30 days of the disapproval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). If EPA develops its own 303(d) List, after a public comment period on that list or any revisions by EPA to the state's proposed list, EPA must send the 303(d) List to the state, and the state must incorporate EPA's 303(d) List into its water quality management plan. 40 C.F.R. § 130.7(d)(2).

29.    In addition to the requirements of section 303(d), CWA section 305(b) requires each state to provide a biennial report including "a description of the water quality of all navigable waters in such State" and "an analysis of the extent to which all navigable waters of such State provide for the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities in and on the water." 33 U.S.C. § 1315(b)(1)(A),

(B). States, including Virginia, submit the report required by section 305(b) along with the 303(d) list in an Integrated Report.

30.    States are required to use the "water quality data and problems identified in the 305(b) report" to "develop water quality management (WQM) plan elements to help direct all subsequent control activities." 40 C.F.R. § 130.8(a). The water quality management plan constitutes the state's comprehensive goals and strategies for ensuring that its waters satisfy water quality standards. *See id.* §§ 130.2(k), 130.6. "Water quality problems identified in the 305(b) report should be analyzed through water quality management planning leading to the development of alternative controls and procedures for problems identified in the latest 305(b) report." *Id*. § 130.8(a); *see also id.* § 130.6(b) ("WQM plans draw upon the water quality assessments to identify priority point and nonpoint water quality problems, consider alternative solutions and recommend control measures, including the financial and institutional measures necessary for implementing recommended solutions. State annual work programs shall be based upon the priority issues identified in the State WQM plan."). Waters that are not listed in the 305(b) report would not be subject to water quality management plan elements designed to address the problematic pollution.

31.    EPA must submit the 305(b) reports to Congress along with an analysis thereof, and the reports and analyses are available to the public. 33 U.S.C. § 1315(b)(2).

**Judicial Review of EPA Action on State Submissions**

32.    The APA provides that any person who has suffered legal wrong because of agency action or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review of that agency action. 5 U.S.C. § 702.

10

33. The APA states that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). An agency's action is arbitrary and capricious if the agency relied on factors that Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or its explanation is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTS

### Virginia's 2024 Integrated Report

34. On April 22, 2024, VDEQ released its draft "2024 305(b)/303(d) Water Quality Assessment Integrated Report." In comments submitted to VDEQ and EPA on May 22, 2024, Wild Virginia pointed out that the draft Integrated Report failed to include any analysis of the large body of data in VDEQ's possession showing PFAS contamination in surface waters, sediments, and fish tissue. Specifically, Wild Virginia identified 29,523 pieces of data on VDEQ's Statewide PFAS Sampling Dashboard, including 8,793 pieces of PFAS data taken from 83 separate sampling sites during the six-year assessment period covered by the draft Integrated Report. Those included results from analysis of PFAS in surface water, sediments, and fish tissue. Though it generally acknowledged the issue of PFAS pollution, the draft Integrated Report did not in any way assess the available PFAS data to determine whether any of Virginia's waters were not supporting their designated uses or otherwise violating water quality standards as a result of PFAS pollution, nor did it provide a "technical, science-based rationale" for failing to do so.

11

35.     In its comments, Wild Virginia drew particular attention to data showing substantially elevated levels of a particular PFAS chemical—a chemical alternatively known as perfluorooctane sulfonic acid, perfluorooctane sulfonate, or "PFOS," which EPA has determined is harmful to human health and a likely carcinogen—in the Middle Chickahominy River watershed. Fish tissue data collected from each of eight monitoring stations in the river and connected White Oak Swamp showed significantly elevated PFOS levels in samples from numerous fish species. Of 31 fish samples collected during this reporting period, 19 (61 percent) exceeded 10,000 parts per trillion. The largest concentration, 68,200 parts per trillion, was found in Bluegill collected in White Oak Swamp. Those levels could easily lead to exceedance of PFOS consumption thresholds that various scientific and governmental bodies have established to protect human health. *See* The Agency for Toxic Substances and Disease Registry, *Guidance for Assessment of Per- and Polyfluoroalkyl Substance (PFAS) in Fish and Other Aquatic Organisms*, available at https://perma.cc/2ZL7-TP9C.

36.     On August 21, 2024, Virginia released a guidance document that established an acceptable concentration of PFOS in edible fish tissue of 0.01 parts per million, or 10,000 parts per trillion. Virginia Department of Health, "Guideline for Issuance of Fish Consumption Advisory Due to Contamination of Fish with Perfluorooctane Sulfonate."

37.     VDEQ performed the fish tissue sampling after it was alerted by Newport News Waterworks of elevated PFAS concentrations in the Middle Chickahominy River watershed, one of several sources of drinking water for Newport News, VA. *See* VDEQ, *Middle Chickahominy River PFAS Investigation*, available at https://perma.cc/CK9N-L49S.

38.     In response to the results of the sampling in the Middle Chickahominy watershed, Virginia officials recommended, in a December 9, 2022 guidance document titled "Provisional

12

PFAS Screening Values for Surface Waters Designated as Public Water Supplies (PWS), Non-PWS Surface Waters, and Fish Tissue," that "sensitive populations (e.g., children and pregnant women) avoid eating fish from the Middle Chickahominy River watershed until the United States Environmental Protection Agency (EPA) finalizes recommendations to protect human health from exposure through fish ingestion." VDEQ and VA Dept. of Health, Storymap: Middle Chickahominy PFAS Study, October 15, 2022, https://perma.cc/9CLL-56SY.

39.     In its comments on the draft Integrated Report, Wild Virginia explained that the recommendation effectively constituted an admission that PFOS and other PFAS pollution is interfering with important uses of the waterbodies, such as fish consumption and recreation, and thus preventing compliance with Virginia's narrative water quality criteria and anti-degradation policy, both of which require maintenance of designated and existing uses.

40.     The Virginia Department of Health subsequently issued a PFOS fish consumption advisory for the Middle Chickahominy River, limiting consumption of Chain Pickerel, Largemouth Bass, and Sunfish to two meals per month, and for White Oak Swamp, recommending no consumption of Creek Chubsucker, Chain Pickerel, and Sunfish. The advisory is not limited to sensitive populations such as children. VDEQ, *Fish Consumption Advisory*, https://perma.cc/RUG9-4HN4.

41.     Wild Virginia's comments also highlighted a number of other waterbodies that VDEQ's data showed significantly exceeded EPA's recommended drinking water standard for PFOS, some by as much as an order of magnitude.

42.     Wild Virginia noted that numerous other states—including Alabama, Maryland, Minnesota, Michigan, and Wisconsin—had listed waterbodies as impaired based on high levels of PFOS in fish and other PFAS data, and requested that VDEQ follow course so that the

corrective measures that flow from inclusion on the 303(d) List could begin to be implemented and Virginia could address PFAS pollution in the state's waters as required by the CWA.

43. On March 28, 2025, VDEQ submitted its final 303(d) List to EPA as part of the final "Virginia's 2024 305(b)/303(d) Water Quality Assessment Integrated Report" (the "Integrated Report," attached without its appendices as Exhibit 1), stating that only "minor revisions were made from the draft to the final version of the 2024 [Integrated Report]." March 28, 2025 Letter from Elizabeth McKercher, Director, VDEQ Water Planning Division, to Michelle Price-Fay, Director, EPA Region III Water Division. The Integrated Report purported to "provide[] the results of Virginia's water quality assessments for monitoring data collected in the six-year period between Jan. 1, 2017, through Dec. 31, 2022." Integrated Report at 1. Despite the voluminous data collected during that review period showing contamination of state waters with PFAS, VDEQ did not use that data to determine if any Virginia waters were impaired due to PFAS.

44. The final Integrated Report did not assess whether the levels of PFOS contamination in the Middle Chickahominy River watershed were causing impairment, despite Virginia's recommendation against fish consumption (ultimately reflected in a fish consumption advisory) that effectively admitted the waters were not supporting their designated uses, nor did it provide a "technical, science-based rationale" for not doing so.

45. Instead, the Integrated Report's references to PFAS are limited to Chapter 6, which describes Virginia's water quality programs. Section 6.6.7, entitled "Emerging Contaminants: Per- and Polyfluoroalkyl Substances (PFAS)," begins with a paragraph of background information on PFAS. Integrated Report at 269. Of the potential harm that PFAS

pose, the IR states only that: "Some PFAS can accumulate in people and animals with repeated exposure, which may have adverse human health effects." *Id*.

46.    The Integrated Report then gives a timeline of efforts by DEQ and other agencies and localities to study the presence of PFAS in certain Virginia waters. It describes efforts since October 2021 to respond to "elevated PFAS concentrations in the Middle Chickahominy River watershed" by "identifying any potential risks to public health." *Id*. at 269–70.  It explains that "DEQ contracted with the United States Geological Survey (USGS) to complete a study of PFAS in the Middle Chickahominy River watershed. Fish tissue, sediment and surface water samples were collected at locations throughout the watershed, including in Chickahominy Lake, to understand the possible exposure pathways for human health." *Id*. at 270. Despite the narrative of efforts aimed at collecting data throughout the Middle Chickahominy River watershed, the Integrated Report does not discuss the results of those efforts or draw any conclusions as to whether any portion of the watershed is impaired for any designated uses.

47.    The Integrated Report then moves on to discussing a 2022 study investigating the presence of a different PFAS chemical, HFPO/GenX, which it states "was detected in the Roanoke River, Spring Hollow Reservoir, and associated drinking water supply that serves portions of Roanoke, Franklin, and Botetourt Counties. Fish tissue and surface water samples were collected at locations throughout the watershed, including in Spring Hollow Reservoir, to understand the possible exposure pathways for human health." *Id.* As with the Middle Chickahominy study, the Integrated Report does not discuss the results or draw any conclusions regarding impairment.

48.    Further, although this section also indicates that VDEQ has been monitoring surface waters for PFAS since 2021, such that some of that data was collected within the

Integrated Report's 2017–22 review period, it does not discuss the levels of PFAS in the sampling data nor whether those levels indicate impairment. *Id.*

49.     The Integrated Report notes that, after the draft 2024 Integrated Report was published in April of 2024, further PFOS was detected in fish tissue collected from the Chickahominy River and White Oak Swamp, leading to the Virginia Department of Health's fish consumption advisory guideline for PFOS discussed above. In an apparent excuse for its failure to make an impairment determination, VDEQ in the Integrated Report stated that "[s]hould the VDH PFOS Guideline become effective, any resulting fish consumption advisories will be used to assess waters in subsequent Integrated Reports." *Id.* at 271. It also states that EPA's "draft recommended water quality criteria protective of human health for PFOA, PFOS, and PFBS . . . will not be considered for adoption in Virginia's Water Quality Standards regulation until they are finalized by EPA." *Id.* The Integrated Report does not, however, provide a technical, science-based rationale for why VDEQ could not make impairment determinations based on the voluminous data available to it—data which led other Virginia regulators to determine that fish consumption was unsafe as a result of PFOS contamination.

### EPA's Action (and Inaction) in Response to VDEQ's Submission

50.     EPA did not approve or disapprove VDEQ's submission within the 30-day period mandated by CWA section 303(d). Rather, EPA appears to have attempted to convince VDEQ to remedy its failure to provide a scientific rationale for not listing any waters as impaired by PFAS, particularly those waters in the Middle Chickahominy River watershed showing substantially elevated levels of PFOS in fish tissue.

51.     In an April 17, 2025 email to VDEQ, the Director of the Water Division for EPA Region III stated that "[i]t is my understanding that VDEQ didn't provide a scientific, technical

justification for not using the data for the issue that we spoke about this morning," referencing the data for the Middle Chickahominy. EPA proposed that VDEQ "could withdraw and update the rationale for the segment we were discussing and resubmit. . . . We would most likely act in less than 30 days as we have already reviewed and only have question [sic] in one area.  This would be focused on 'why this data does not support listing at this time' vs the delay in the [fish consumption] advisory."

52.     VDEQ did not, however, withdraw and update any portion of the 2024 Integrated Report nor otherwise cure its failure to provide a technical, science-based rationale for not assessing or listing the Middle Chickahominy River watershed or any other of Virginia's waters for which PFAS contamination data exists.

53.     On July 28, 2025, four months after VDEQ's initial submission and with no further relevant submissions from VDEQ, EPA issued a letter approving Virginia's 2024 303(d) list contained in the Integrated Report. Despite purporting to approve VDEQ's submission, EPA qualified its action by stating that:

> While the EPA is approving all waterbody-pollutant combinations identified on Virginia's 2024 303(d) list, the EPA is taking no action, at this time, on water quality related information suggesting the presence of perfluorooctane sulfonic acid (PFOS) in fish tissue in certain segments in the Middle Chickahominy River watershed. Until such time as EPA takes action, those waterbody-pollutant combinations will remain in the same Integrated Report category consistent with Virginia's 2024 303(d) list as submitted.

July 28, 2025 Letter from Michelle Price-Fay, Director, EPA Region III Water Division, to Elizabeth McKercher, Director, VDEQ Water Planning Division, at 1.

54.     EPA's letter was accompanied by an enclosure, titled "Rationale for EPA Approval of Virginia's 2024 Clean Water Act Section 303(d) List" ("July 28, 2025 Rationale," attached as Exhibit 2) in which EPA further explains that "[w]hile EPA is approving all

17

waterbody-pollutant combinations identified on Virginia's 2024 303(d) list, EPA is taking no action at this time on water quality related information suggesting the presence of PFOS in fish tissue in certain segments in the Middle Chickahominy River watershed." Rationale at 1.

55.   The July 28, 2025 Rationale acknowledges EPA's duty arising under 40 CFR § 130.7(b)(6)(iii) to determine whether a state has provided a "technical, science-based rationale for decisions not to use data or information in developing" its 303(d) list. *Id.* at 2–3. EPA found that "Virginia generally provided a rationale for not using the data it assembled and evaluated to develop its list" but limited that conclusion to "the waters on which the EPA is taking action," i.e., those *other than* the Middle Chickahominy River watershed. *Id.* at 3.

56.   Regarding waters potentially impaired by PFAS, including the Middle Chickahominy, EPA states that it:

> is taking no action at this time while the EPA continues to work with VADEQ in the near term to assess waters where samples suggest the presence of per- and polyfluoroalkyl substances (PFAS). Following publication of the draft 2024 303(d) list, VADEQ received public comment from Wild Virginia drawing attention to water quality-related information regarding certain fish tissue and ambient water chemistry data for perfluorooctane sulfonic acid (PFOS) in the Middle Chickahominy River watershed and urging that certain segments in that watershed be identified as [impaired] for PFOS on Virginia's 2024 303(d) list. The EPA received a similar letter from Wild Virginia following Virginia's submission of the final draft 2024 303(d) list pursuant to 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.7(d). The EPA's action pursuant to 33 U.S.C. § 1313(d)(2) on segments where there is water quality-related data suggesting the presence PFOS remains pending. A list of these segments is provided in Appendix B. Until such time as the EPA takes action, those waterbody-pollutant combinations will remain in the same Integrated Report category consistent with Virginia's 2024 303(d) list as submitted.

July 28, 2025 Rationale at 8. In an apparent attempt to pass off its present duties to a later date, EPA states that it "anticipates that VADEQ will use the information it has collected to update its Assessment Methodologies for its 2026 Section 303(d) list, including how it will evaluate data suggesting the presence of PFAS." *Id.* The July 28, 2025 Rationale does not mention EPA's

previous determination, delivered in its email to VDEQ, that VDEQ would need to address its lack of technical, science-based rationale for ignoring the PFAS data before EPA could approve its 303(d) List.

57.    Appendix B to the July 28, 2025 Rationale lists the segments for which EPA purports to "tak[e] no action at this time":

### Enclosure 3
### Appendix B – List of Segments as to which EPA is taking no action at this time

| AUID | ASSESSMENT_UNIT_NAME | WATER_TYPE_NAME | WATER_SIZE | UNITS |
|---|---|---|---|---|
| VAP-G08E_CHK02A00 | Chickahominy River | ESTUARY | 5.468 | Square Miles |
| VAP-G08E_CHK01A00 | Chickahominy River | ESTUARY | 1.3726 | Square Miles |
| VAP-G07R_CHK01A00 | Chickahominy River | RIVER | 11.03 | Miles |
| VAP-G07L_CHK01A00 | Chickahominy Lake | RESERVOIR | 1050.47 | Acres |
| VAP-G06R_WOS01A98 | White Oak Swamp | RIVER | 6.69 | Miles |
| VAP-G06R_CHK03A02 | Chickahominy River | RIVER | 2.34 | Miles |
| VAP-G06R_CHK02A14 | Chickahominy River | RIVER | 11.78 | Miles |
| VAP-G06R_CHK01A98 | Chickahominy River | RIVER | 7.46 | Miles |

58.    Despite acknowledging that the PFOS contamination data available to VDEQ led the Virginia Department of Health to issue a fish consumption advisory, July 28, 2025 Rationale at 8, EPA did not disapprove Virginia's 303(d) List or promulgate its own list of impaired waters. EPA's failure to disapprove Virginia's 303(d) List's that did not identify any waterbody segments as impaired for PFAS prevented it from developing its own impairment list for Virginia, which would lead to the development of TMDLs and other pollution reduction measures required for the impaired waterbodies to comply with Virginia's water quality standards.

59.    The July 28, 2025 Rationale does not describe any methodology or evaluation by VDEQ of existing PFAS data outside of the Chickahominy River watershed segments for which EPA purported to "tak[e] no action at this time."

60.    On June 8, 2026, EPA took a second action to approve in its entirety the same 303(d) List that was submitted by VDEQ on March 28, 2025, thus supplementing its previous final action with an action on the previously excluded Chickahominy watershed segments. *See* Doc. 33-1 ("Notice of Subsequent Agency Action"). The Cover Letter to VDEQ refers to the July 28, 2025 approval and does not purport to alter that approval or EPA's rationale for that approval, other than that EPA was now taking action on the Chickahominy watershed segments that it had previously purported to take no action. The June 8, 2026 action approved VDEQ's decision not to list the Chickahominy watershed segments as impaired for PFAS, and provided a rationale specific to that approval.

61.    The rationale in support of the approval ("June 8, 2026 Rationale," ECF 33-1, 4–7) makes clear that it is "supplemental" to the earlier decision. ECF 33-1, at 4. While the June 8, 2026 Rationale incorporates by reference the earlier July 28, 2025 Rationale, no new information or explanation is provided for waters other than those in the Chickahominy River watershed upon which the agency had previously purported to take no action. *Id.* ("The EPA incorporates by reference its Decision Rationale as sent to VADEQ on July 28, 2025, and with respect to the Table A [Chickahominy watershed] segments, adds the following . . . .").

62.    Neither the June 8, 2026 cover letter or rationale address the statement from EPA's July 28, 2025 acknowledging the existence of "water quality related information suggesting the presence of perfluorooctane sulfonic acid (PFOS) in fish tissue in certain segments in the Middle Chickahominy River watershed."

63.    The June 8, 2026 Rationale makes clear that fish tissue data from the Chickahominy River watershed were available in the 2017 to 2022 assessment period leading to the 2024 Integrated Report. It also makes clear that those or similar data led to the issuance of a fish consumption advisory by the Virginia Department of Health ("VDH") shortly after the submission of the Integrated Report in 2025.  ECF 33-1 at 6–7.

64.    The June 8, 2026 Rationale proceeds by referring to methodologies that VDEQ reported it will or may use to evaluate PFAS data in the future but fails to explain any methodology that VDEQ relied upon to evaluate existing PFAS data for the 2024 Integrated Report.

65.    The June 8, 2026 Rationale notes that the VDH has and will continue to issue fish consumption advisories based on fish tissue data collected in Virginia. It does not address any methodologies that VDEQ used to evaluate the PFAS-related fish tissue data for compiling the Integrated Report.

66.    In a footnote, the June 8, 2026 Rationale states: "The EPA does not approve or disapprove assessment methodologies. Instead, in acting on CWA 303(d) lists, the EPA evaluates whether the state, territory, or authorized tribe met listing requirements in determining whether applicable WQS are met and included waters requiring TMDLs on its 303(d) list." ECF 33-1 at 5 n.3.

67.    The June 8, 2026 Rationale—like the July 28, 2025 Rationale—wholly fails to address VDEQ's evaluation or consideration of any PFAS data other than fish tissue data, including data collected by the agency in surface waters since 2021 or in conjunction with the 2022 PFAS study.

21

68.     Neither the June 8, 2026 Rationale nor the July 28, 2025 Rationale describe any evaluation by EPA or VDEQ of PFAS data other than fish consumption for water quality impairments in the 2024 Integrated Report.

## **FIRST CLAIM FOR RELIEF**

### **(July 28, 2025 Agency Action That Is Arbitrary and Capricious or Not in Accordance With Law in Violation of the APA)**

69.     Wild Virginia realleges and incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth below.

70.     CWA Section 303(d) requires states to periodically develop and submit a list of waters within their borders that are not meeting water quality standards, including narrative criteria and antidegradation policies that mandate the protection of designated and existing uses such as recreation, fish consumption, and drinking water. 33 U.S.C. § 1313(d)(1)(a); 40 C.F.R. § 130.7(b)(3).

71.     In preparing their 303(d) Lists, states "shall assemble and evaluate all existing and readily available water quality-related data and information" and EPA is required to determine whether a state has provided a technical, science-based rationale for not using any such data. 40 C.F.R. § 130.7(b)(5).

72.     Once a state submits a 303(d) List to EPA, EPA must approve or disapprove the 303(d) List within 30 days. 33 U.S.C. § 1313(d)(2). If EPA disapproves the state's 303(d) List, EPA must identify the impaired waters itself based on available data within 30 days of the disapproval. *Id.*

73.     In preparing the Commonwealth's 303(d) list, VDEQ failed to evaluate all available data to determine whether any of Virginia's waters were not meeting water quality

standards, including Virginia's narrative criteria and antidegradation policy requiring the protection of designated and existing uses, as a result of PFAS pollution.

74.    As described above, this data included a 2022 study and accompanying data investigating the presence of HFPO/GenX, in the Roanoke River, Spring Hollow Reseroir, and associated drinking water supplies for the communities of Roanoke, Franklin, and Botetourt Counties. That data included fish tissue and surface water quality samples. *See* Integrated Report at 269–70.

75.    VDEQ also failed to evaluate PFAS data that it has been collecting since 2021 "in st streams, river, and reservoirs across the Commonwealth to understand the prevalence of [those] substances and to identify potential locations where PFAS concentrations are elevate relative to baseline conditions." *Id.* at 270.  Similarly, VDEQ failed to evaluate PFAS data from fish tissue samples that have been collected since 2023.  *Id.*

76.    EPA's July 28, 2025 approval of Virginia's 303(d) List—other than the stream segments upon which EPA purported to take no action—constituted final agency action on VDEQ's submittal that was arbitrary and capricious and not in accordance with law, and is reviewable under the APA. 5 U.S.C. §§ 702, 706(2)(A).

77.    EPA self-described its June 8, 2026 action as "supplemental" and contained a rationale pertaining only to the Chickahominy River watershed sections upon with the agency had previously failed to take action. ECF 33-1 at 4. The June 8, 2026 does not supersede the July 28, 2025 or render it no longer a final agency action.

78.    EPA's July 28, 2025 Rationale for approving Virginia's Integrated Report did not address VDEQ's failure to evaluate PFAS data for waters outside of the Chickahominy River watershed.

23

79.     EPA's July 28, 2025 Rationale for approving Virginia's Integrated Report did not address VDEQ's failure to evaluate PFAS data for water quality impairments other than fish consumption.

80.     EPA's July 28, 2025 approval of Virginia's Integrated Report is arbitrary and capricious and not in accordance with law, and thus must be vacated under the APA, because VDEQ's submission does not satisfy statutory and regulatory requirements to consider and act upon all available data, specifically data indicating impairment by PFOS and other PFAS.

## SECOND CLAIM FOR RELIEF

### (June 8, 2026 Agency Action That Is Arbitrary and Capricious or Not in Accordance With Law in Violation of the APA)

81.     Wild Virginia realleges and incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth below.

82.     CWA Section 303(d) requires states to periodically develop and submit a list of waters within their borders that are not meeting water quality standards, including narrative criteria and antidegradation policies that mandate the protection of designated and existing uses such as recreation, fish consumption, and drinking water. 33 U.S.C. § 1313(d)(1)(a); 40 C.F.R. § 130.7(b)(3).

83.     In preparing their 303(d) Lists, states "shall assemble and evaluate all existing and readily available water quality-related data and information" and EPA is required to determine whether a state has provided a technical, science-based rationale for not using any such data. 40 C.F.R. § 130.7(b)(5).

84.     Once a state submits a 303(d) List to EPA, EPA must approve or disapprove the 303(d) List within 30 days. 33 U.S.C. § 1313(d)(2). If EPA disapproves the state's 303(d) List,

EPA must identify the impaired waters itself based on available data within 30 days of the disapproval. *Id.*

85. In preparing the Commonwealth's 303(d) list, VDEQ failed to evaluate all available data to determine whether any of Virginia's waters were not meeting water quality standards, including Virginia's narrative criteria and antidegradation policy requiring the protection of designated and existing uses, as a result of PFAS pollution.

86. EPA's June 8, 2026 action left in place EPA's July 28, 2025 approval of the Commonwealth's 303(d) List and contained no final action other than the approval of the Chickahominy watershed segments upon which it purported to take no action on July 28, 2025, such that this Second Claim for Relief alleges that EPA's June 8, 2026 approval of VDEQ's failure to list the Chickahominy segments as impaired for PFAS violates the APA.

87. In the alternative, if the June 8, 2026 superseded the July 28, 2025 action or if the July 28, 2025 action was otherwise not a final agency action, then the June 8, 2026 decision served as a final agency action approving the Commonwealth's 303(d) List for all waters. Under this alternative, this Second Claim for Relief alleges that EPA's June 8, 2026 action violates the APA with respect to all Virginia waters.

88. The June 8, 2026 approval did not provide any new rationale or explanation for waters other than those upon which EPA previously took "no action" and was thus arbitrary and capricious or contrary to law in violation of the APA for the same reasons explained in Wild Virginia's First Claim for Relief.

89. The June 8, 2026 Rationale fails to provide any rational explanation for approval of the Integrated Report despite VDEQ's failure to examine its own fish tissue data from samples in the Chickahominy River watershed and elsewhere in Virginia.

25

90. The June 8, 2026 Rationale fails to provide any rational explanation for approval of the Integrated Report despite VDEQ's additional failure to evaluate types of PFAS-related data other than fish tissue data, including data collected by the agency in surface waters since 2021 or in conjunction with the 2022 PFAS study.

91. As with the July 28, 2025 Rationale, EPA failed to provide any rational explanation for approval of the Integrated Report despite VDEQ's failure to evaluate existing PFAS for water quality impairments other than fish consumption.

92. In preparing the Commonwealth's 303(d) list, VDEQ failed to evaluate all available data to determine whether any of Virginia's waters were not meeting water quality standards, including Virginia's narrative criteria and antidegradation policy requiring the protection of designated and existing uses, as a result of PFAS pollution.

93. EPA's June 8, 2026 approval of Virginia's Integrated Report is arbitrary and capricious and not in accordance with law, and thus must be vacated under the APA, because VDEQ's submission does not satisfy statutory and regulatory requirements to consider and act upon all available data, specifically data indicating impairment by PFOS and other PFAS. Further, EPA failed to rectify its approval of VDEQ's submission with the Direction of the Region III Water Division's prior determination that "VDEQ didn't provide a scientific, technical justification for not using the [PFOS] data" such that the agency would need to "withdraw and update the rationale."

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this court enter an Order:

(1) Declaring that EPA's actions approving Virginia's 2024 303(d) list were arbitrary and capricious and not in accordance with law under the APA;

(2) Vacating EPA's actions approving Virginia's 2024 303(d) list;

(3) Awarding Plaintiff's attorney fees and all other reasonable expenses incurred in pursuit of this action; and

(4) Granting other such relief as the Court deems just and proper.

Dated: August 3, 2026                                Respectfully submitted,


                                                     s/Claire Horan
                                                     Claire Marie Horan (VSB No. 95386)
                                                     APPALACHIAN MOUNTAIN ADVOCATES
                                                     P.O. Box 403
                                                     Charlottesville, VA 22902
                                                     (907) 687-9561
                                                     choran@appalmad.org

                                                     Isak Jordan Howell (VSB No. 75011)
                                                     APPALACHIAN MOUNTAIN ADVOCATES
                                                     P.O. Box 2186
                                                     Roanoke, VA 24009
                                                     (540) 998-7744
                                                     isak@howell-lawoffice.com


                                                     *Counsel for Wild Virginia*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND**

**WILD VIRGINIA, INC.,**

        **Plaintiff,**

        **v.**                              **CIVIL ACTION NO. 3:25-cv-1043**

**UNITED STATED ENVIRONMENTAL
PROTECTION AGENCY; LEE ZELDIN,
in his official capacity as Administrator of
U.S. Environmental Protection Agency;
AMY VAN BLARCOM-LACKEY, in her
official capacity as Regional Administrator
for U.S. Environmental Protection Agency
Region III,**

        **Defendants.**

## CERTIFICATE OF SERVICE

I, Claire Marie Horan, do hereby certify that on August 3, 2026, I electronically filed

the foregoing document with the Clerk of the Court using the CM/ECF filing system.

s/Claire Horan
Claire Marie Horan (VSB No. 95386)
Appalachian Mountain Advocates
P.O. Box 403
Charlottesville, Virginia 22902
choran@appalmad.org
(907) 687-8561

*Counsel for Wild Virginia*