**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**AT RICHMOND**

**WILD VIRGINIA, INC.,**

**Plaintiff,**

**v.** **CIVIL ACTION NO. 3:25-cv-1043**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of U.S. Environmental Protection Agency; AMY VAN BLARCOM-LACKEY, in her official capacity as Regional Administrator for U.S. Environmental Protection Agency Region III,**

**Defendants.**

# PLAINTIFF'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

## INTRODUCTION

The establishment of a list of impaired streams under section 303(d) of the Clean Water Act is a cornerstone of the law, as the list paves the way for the protection and restoration of waters across the country. A state, in this case Virginia, must develop a list of impaired streams, and EPA must then approve or disapprove of that list. In Virginia's 2024 303(d) list, the state recognized per- and polyfluoroalkyl substances (PFAS) as dangerous contaminants and acknowledged there were health advisories warning against human consumption of fish due to PFAS pollution. Despite having substantial PFAS data from Virginia's streams and recognizing the serious risks, the Virginia Department of Environmental Quality (VDEQ) undertook no independent analysis of PFAS pollution. It then failed to list as impaired waters that clearly had high levels of PFAS pollution.

Initially, on July 28, 2025, EPA purported to take "no action" (evading the mandatory duty to approve or disapprove of such lists) on water quality information suggesting PFAS impairment in the Chickahominy River watershed. Only well after the filing of this case, on June 8, 2026, did EPA reverse course and approve Virginia's 303(d) list in full, a list that did not recognize the PFAS impairment of Chickahominy River and White Oak Swamp. It also disregarded thousands of other sampling data for PFAS in other waters. In doing so, EPA and VDEQ effectively turned the same blind eye to the problem, despite knowing the risks to humans and the environment.

EPA's approval was arbitrary and capricious, and therefore unlawful, because EPA approved a list that did not include waters known by EPA to be contaminated with PFAS. EPA had actual knowledge of PFAS stream impairment and nonetheless approved Virginia list, which failed to address that impairment. Even beyond the PFAS impairment of two water bodies, EPA also failed to analyze the raft of information about PFAS in Virginia's waters statewide. VDEQ collected the data, but then punted the PFAS issue to another year; EPA, though it expressed some concerns, punted as well. Simply put, Virginia submitted a faulty list, EPA knew it was faulty, and EPA initially avoided a decision but ultimately doubled down and approved the list anyway. That arbitrary approval, disregard of an important issue, and lack of reasoned analysis was unlawful.

Plaintiff's First Amended Complaint sets forth two claims. The first claim challenges EPA's July 28, 2025 action approving VDEQ's 303(d) List, alleging that it was a violation of the Administrative Procedure Act (APA) to fail to address VDEQ's failure to evaluate PFAS impairment beyond the Chickahominy River and impairment beyond human fish consumption. The second claim challenges EPA's June 8, 2026 action, alleging that it was a violation of the

APA to approve VDEQ's failure to list the Chickahominy as impaired for PFAS. The first claim is addressed in section II.B below. The second claim is addressed in section II.A below.

## LEGAL FRAMEWORK

Congress enacted the Clean Water Act ("CWA" or "Act") in 1972 to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). A principal purpose of the CWA is to achieve and maintain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." *Id.* at §§ 1251(a)(1), (2). To achieve those ends, Section 303 of the CWA requires each state to establish and implement water quality standards, subject to review and approval by EPA. *Id.* at §§ 1313(a)–(c), 1362(3).

Water quality standards consist, *inter alia*, of the "designated uses" of a state's waters and "the water quality criteria for such waters based upon such uses," and shall be such to "protect the public health or welfare, enhance the quality of water and serve the purposes of [the Act.]" *Id.* at § 1313(c)(2)(A); 40 C.F.R. § 130.2(d). These "designated uses" consist of purposes a section of waters must support, such as fishing, recreation, aquatic life, or drinking water, to name a few. Water quality standards established to ensure that the designated uses are supported include both narrative and numeric criteria. 40 C.F.R. § 130.7(b)(3).

Virginia has established certain designated uses as applicable to all state waters. These include, "recreational uses, e.g. swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; wildlife; and the production of edible and marketable natural resources, e.g. fish and shellfish" 9 Va. Admin. Code § 25-260-10(A). Specific waters, such as Potomac Creek, Broad Run near Manassas, and Chopawamsic Creek near the Quantico Marine Base, to name a few, are designated as public drinking water sources. 9 Va. Admin. Code § 25-260-

380(D)(1)("Public water supplies" designations permitted); 9 Va. Admin. Code § 25-260-390-540 (listing specific water bodies as public water supplies). Virginia has adopted narrative water quality criteria to protect those uses, which provide in part:

> State waters, including wetlands, shall be free from substances attributable to sewage, industrial water, or other waste in concentrations, amounts, or combinations which contravene established standards, or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant or aquatic life.
>
> Specific substances to be controlled include, but are not limited to . . . toxic substances (including those which bioaccumulate). . .

*Id.* § 25-260-20(A).

A critical step in assessing and protecting water quality is the identification of waters that are not meeting water quality standards. CWA section 303(d) mandates that each state "shall identify those waters within its boundaries for which [effluent limits in permits] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(a). Regulations passed pursuant to the Act specify that "applicable" water quality standards "include[e] numeric criteria, narrative criteria, waterbody uses, and antidegradation requirements." 40 C.F.R. § 130.7(b)(3). Such lists must be submitted every two years. *Id.* at 130.7(d)(1). They are commonly referred to as "303(d) Lists."

In developing 303(d) Lists, states "are required to assemble and evaluate all existing and readily available water quality-related data and information" including in "[w]aters for which water quality problems have been reported by local, state, or federal agencies; members of the public; or academic institutions." *Id.* at 130.7(b)(5), (iii). States must use all such information in developing the 303(d) List unless they provide a rationale not to do so. *Id.* 130.7(b)(6)(iii). Under applicable guidance, EPA explains that the agency "will evaluate whether a state, territory, or authorized tribe provides a technical, science-based rationale for decisions not to use data or

information." U.S. EPA, "2024 Integrated Report Memorandum: Information Concerning 2024 Clean Water Act Sections 303(d), 305(b) and 314 Integrated Reporting and Listing Decisions," at 9; EPA0005480 (citing 40 C.F.R. § 130.7(b)(5)). EPA further explains that "[i]t is important to note that the lack of an assessment methodology [for a particular type of pollutant or impairment] does not negate the requirement, in developing the CWA 303(d) list, to assemble and evaluate all existing and readily available water quality-related data and information and use such data and information to determine if applicable [water quality standards] (including numeric and narrative criteria) are attained (unless a rationale is provided for not using particular data or information.)" *Id.* at 15. Moreover, "Assessment Guidance" from the Virginia Department of Environmental Quality ("VDEQ") makes clear that for 303(d) List purposes "[a]ssessment data are compared to both numeric and narrative criteria established for Virginia's designated uses and promulgated in its water quality standards." VDEQ Guidance Memo No. GM23-2002, "VDEQ 2024 Water Quality Assessment Guidance Manual" at 6, EPA0004837.

The 303(d) Lists serve as more than just and assessment tool—they are the first step in creating management plans necessary to achieve and maintain water quality standards and the Act's overall purpose to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." *See* 33 U.S.C. § 1251(a). Once a state identifies an "impaired water" it must then develop a total maximum daily load ("TMDL") 40 C.F.R. 130.7(a). A TMDL establishes the maximum quantity, or load, of a particular pollutant that the water body can receive per day while still meeting applicable water quality standards, including narrative criteria. *Id.* at 130.7(c). The TMDLs establish wasteload allocations, which apportion the maximum load among dischargers to the waterbody through effluent limitations in individual permits to ensure that water quality standards are met. *Id.* If a waterbody is not identified as

impaired on a 303(d) List, no TMDL will be developed and necessary pollution reductions to allow the waterbody to meet water quality standards will not be implemented. In other words, inclusion on the 303(d) List is a critical initial step in addressing the pollution.

In addition to the requirements of CWA section 303(d), CWA section 305(b) requires each state to provide a biennial report including "a description of the water quality of all navigable waters in such State" and "an analysis of the extent to which all navigable waters of such State provide for the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities in and on the water." 33 U.S.C. § 1315(b)(1)(A). States, including Virginia, typically submit the required section 305(b) report along with the 303(d) list in an Integrated Report.

States are required to use the "water quality data and problems identified in the 305(b) report" to "develop water quality management ("WQM") plan elements to help direct all subsequent control activities." 40 C.F.R. § 130.8(a). The water quality management plan constitutes the state's comprehensive goals and strategies for ensuring that its waters satisfy water quality standards. *See id.* §§ 130.2(k), 130.6. "Water quality problems identified in the 305(b) report should be analyzed through water quality management planning leading to the development of alternative controls and procedures for problems identified in the latest 305(b) report." *Id.* at 130.8(a); *see also, id.* 130.6(b) ("WQM plans draw upon the water quality assessments to identify priority point and nonpoint water quality problems, consider alternative solutions and recommended control measures, including the financial and institutional measures necessary for implementing recommended solutions. State annual work programs shall be based upon the priority issues identified in the State WQM plan"). Waters that are not listed in the 305(b) report would not be subject to WQM plan elements designed to address the problematic

pollution. EPA must submit the state 305(b) report to Congress along with an analysis thereof. 33 U.S.C. § 1315(b)(2).

## FACTS

### I. PLAINTIFF WILD VIRGINIA HAS MEMBERS WHO ARE ADVERSELY AFFECTED BY EPA'S APPROVAL DESPITE VDEQ'S FAILURE TO ANALYZE PFAS DATA FOR ITS 303(d) LIST AND IDENTIFY AFFECTED WATERS PURSUANT TO CWA § 305(b).

At least two members of Wild Virginia use waters affected by PFAS and are adversely impacted by EPA's decision to approve VDEQ's submission of its Integrated Report despite the state agency's failure to appropriately consider and address PFAS. First, Rob Whitehead is a member who has been fishing, kayaking, and swimming in the Chickahominy River as well as other waters throughout Virginia for over 25 years. Ex. 1 at ¶¶ 2, 4. Although he and his family sometimes eat fish he catches, they eat the fish from areas he believes are contaminated by PFAS less than in other areas. *Id.* at ¶ 7. He understands that PFAS causes health problems once it enters the bloodstream. *Id.* In the Chickahominy River, his family has stopped eating fish entirely since the issuance of fish consumption advisories and will not eat fish from that area until there are no longer high levels of PFOS or other PFAS. *Id.* at ¶ 8. He states that he would keep and eat more fish from not only the Chickahominy River, but also the James River if either PFAS pollution were better controlled, or if he had better information on which streams were impaired for PFAS. *Id.* at ¶ 9. In addition to fishing, PFAS contamination has also resulted in Mr. Whitehead curtailing other recreational activities. He no longer swims in areas he believes to be contaminated by PFAS. *Id.* at ¶ 10. Finally, he is concerned about his drinking water, which is sourced from the James River, which he believes is contaminated with PFAS, as it is downstream from the Chickahominy. *Id.* at ¶ 11.

Nancy Armour is a second Wild Virginia member affected by the department's action (or lack thereof) regarding PFAS in Virginia's waters. Ms. Armour lives in Westmoreland County and has a home that abuts the Potomac River. *Id.* at ¶ 2. As a result of concerns over PFAS in the waterway she now limits the amount of fish, seafood, crabs, and oysters sourced from the Potomac River watershed out of fear for her family's health. *Id.* at ¶¶ 3, 7. She is similarly concerned about exposure to PFAS from drinking water. In addition to her home on the Potomac, she and her husband own another property in Woodbridge, Virginia, which sources its water from the Occoquan Reservoir. *Id.* at ¶ 10. She understands that this watershed may also be contaminated with PFAS. *Id.* This makes her concerned about the combined pathways (through fish and shellfish consumption and drinking water) she and her family experience exposure to PFAS. *Id.* at ¶ 10. She uses public information about water quality to make decisions, and she has used such information to decide when to avoid recreation in Virginia waters. *Id.* Ms. Armour is aware that PFAS have been linked to adverse health effects even at very low levels. *Id.* at ¶ 8. She is concerned for her family's health from their exposure to PFAS. *Id.* at ¶ 9.

## II. STATEMENT OF UNDISPUTED FACTS: DEVELOPMENT AND SUBMISSION, AND APPROVAL OF VIRGINIA'S 303(d) LIST AND 305(b) REPORT

Pursuant to this Court's Local Rule 56(B), the following is a specifically captioned statement of undisputed material facts. This case is a challenge to an agency's final action, and the Plaintiff does not dispute the contents of the Administrative Record assembled by the EPA and which has been provided to Plaintiff is to be filed by Defendants in this action. The citations below are to the documents in the Administrative Record assembled by EPA, or official public record EPA documents found in the Federal Register.

Virginia submitted its Integrated Report, including both the 303(d) List of Impaired Streams and 305(b) Report to EPA on March 28, 2025. EPA0000061. That submission recognized per- and polyfluoroalkyl substances (PFAS) as "emerging contaminants." EPA0004439–4441. It noted multiple studies and monitoring efforts that had been taken to identify PFAS in Virginia waters and noted that "[s]ince 2021, DEQ has been monitoring PFAS in streams, rivers, and reservoirs across the Commonwealth to understand the prevalence of these substances and to identify potential locations where PFAs concentrations are elevated relative to baseline concentrations." *Id.* EPA0004440. It noted legislative attention to the problem of PFAS, including a statutory requirement for DEQ to annually report on "PFAS assessments, self-reporting, and discharge monitoring to the Governor and General Assembly." *Id.* It further described action taken by the Virginia Department of Health ("VDH") to conduct a risk assessment for PFAS in the Chickahominy River and White Oak Swamp, including the release of an October 4, fish consumption advisory guideline for PFOS (a particular PFAS chemical). *Id.* at 0004441. VDEQ and VDH jointly investigated "possible exposure pathways for human health" in connection with PFAS found in the Roanoke River and nearby waters. *Id.* at EPA0004440. VDEQ recognized that EPA had published draft criteria to protect public water supplies from certain PFAS, including PFOA, PFOS, and PFBS. *Id.* Finally, it directed the public to a PFAS "dashboard" containing PFAS data and monitoring activities. *Id.* Despite this recognition of available information on PFAS, VDEQ did not take any measures to include in the report an assessment of the PFAS data, or to identify waters which might be impaired as the result of PFAS contamination.

Prior to the final submission by VDEQ, Wild Virginia submitted comments and data to the agency indicating problematic amounts of PFAS in Virginia waters and expressing concern that

these chemicals were not properly evaluated in the development of the Integrated Monitoring Report. Specifically, Wild Virginia drew VDEQ's attention to a warning that had been in place since October 8, 2021 that provided "It is recommended that sensitive populations (e.g. children and pregnant women) avoid fish from the Middle Chickahominy River watershed until EPA finalizes recommendations to protect human health from exposure through fish ingestion." EPA0004121. This warning was repeated in a publicly available study of the PFAS in the Middle Chickahominy by the VDEQ and VDH, published on December 15, 2022. EPA0005108, EPA0005113–5114. ("It is recommended that sensitive populations (e.g. children and pregnant women) avoid eating fish from the Middle Chickahominy River watershed until EPA finalizes recommendations to protect human health exposure through fish ingestion.") Wild Virginia's comments also contained an analysis of Virginia DEQ's own data for PFOS, noted that 22% of the samples exceeded the EPA drinking water standard for PFOS and contained a list of streams with particularly high concentrations of PFOS. EPA0004142. In response to these comments VDEQ cited monitoring programs to assess PFAS, noted legislative action as well as risk assessments and criteria and development underway by VDH and EPA, but did not indicate any analysis of PFAS data that had been conducted by VDEQ itself. EPA0004126–4127.

Following VDEQ's submission of its Integrated Report, Wild Virginia sent another set of comments—this time directly to EPA. In these comments Wild Virginia noted that while VDEQ had data from PFAS in Virginia waters since at least 2021, the report did not contain any analysis or discussion of such data. EPA0005068. Specifically, Wild Virginia informed EPA of VDEQ's failure to assess data for purposes of compliance with narrative water quality standards and designated uses. *See id.,* EPA0005070. Wild Virginia even submitted an analysis showing that based on VDEQ data, applicable guidance and standards that certain waters—notably the

Chickahominy River and White Oak Swamp—were impaired as a result of PFAS. EPA0005072–5085.

Beyond the information in Wild Virginia's comments, the Administrative Record reveals that EPA had other information in its possession that demonstrated certain Virginia waters were impaired for PFAS. For example, the record contains a toxicology report analyzing fish tissue data in White Oak Swamp and Chickahominy River. EPA0005119–5123. The report was authored by a member of the VDEQ PFAS Advisory Panel on April 12, 2025. It concluded that "Based on the data obtained, a median PFOS level of 15,200 ppt would put 100% of 'all' children and adults (gravid or non-gravid) above the level of concern for the HPC (10% increase in cholesterol levels), PHC (liver/pancreatic cancers) and above the LHA set at 0.02 ppt by the EPA – **after eating just 1 serving [of[ fish per month from the Chickahominy River.** EPA0005120 (emphasis added). EPA was also informed of a formal fish consumption advisory issued by VDH on May 9, 2025 for the Chickahominy Watershed. EPA0005219–5220; *see also,* EPA0005223–5224, EPA0005462. EPA had also conducted its own rigorous analysis on the adverse health effects of PFAS, in promulgating national primary drinking water standards. 89 Fed. Reg. 32,532 (April 26, 2024). It found PFAS exposure was associated with a myriad of negative health effects, even at very low levels. *Id.* at 32,532, 32,537.

EPA had justifiable and obvious concerns about approving Virginia's submission despite information demonstrating impairment of waters for PFAS. The record includes numerous emails inquiring about the status of a fish consumption advisory for Chickahominy River and White Oak Swamp. *See e.g.* EPA0005431–5433; EPA005427; EPA0005455; EPA0005462–5466. On April 17, 2025, the Director of the Water Division at EPA's Region 3 informed VDEQ that it was her 'understanding that [VDEQ] didn't provide a scientific justification for the issues we spoke

about this morning." EPA0005468. This email was obviously in reference to fish tissue data on the Chickahominy River and/or White Oak Swamp because it referenced the "delay in the advisory." *Id.*

In the absence of the formal issuance of a formal advisory by VDH, there was, however, sufficient information upon which VDEQ and subsequently EPA could and should have determined that waters were impaired. Since 2018, there has been guidance from the federal Agency for Toxic Substances and Disease Registry for assessing PFAS in fish and other aquatic organisms. EPA0005190. Other states, as noted by Wild Virginia, and the Great Lakes Consortium have established levels of PFOS in fish that call for fish consumption advisories. EPA0005084; EPA0005272. Indeed, Virginia had established guidance for PFOS levels in fish that should trigger a fish consumption advisory by at least August 21, 2024—several months before VDEQ finalized its 2024 Integrated Report. EPA0005061–0005066. This guidance indicates that "[w]hen average PFOS concentrations in fish range from 10 ppb to 20 ppb, VDH recommends limiting consumption of contaminated species to two meals per month." EPA0005065. At average levels "greater than 20 ppb, VDH recommends that contaminated fish should not be consumed." *Id.* Finally, since at least December 9, 2022, a workgroup consisting of representatives from the DEQ Office of Ecology, VDH Office of Drinking Water, and VDH Office of Environmental Health Servies had proposed PFAS values "to be applied to surface waters designated as Public Water Supply," EPA0005390, EPA0005393. These were all sources from which PFAS data could have been evaluated, not only from the Chickahominy and White Oak Swamp areas but statewide.

Despite having information confirming PFAS at unsafe levels for human consumption of fish in the Chickahominy River and White Oak Swamp. And despite the existence of several sources

of information on which PFAS data could be evaluated in areas beyond that watershed, EPA issued a general approval of Virginia's Integrated Report submission on July 28, 2025. EPA000014. However, EPA purported to take "no action" on water quality information suggesting PFAS in the Chickahominy River watershed. EPA0000014. Practically, however, this non-action was no different than an approval because, as described by EPA "those waterbody-pollutant combinations will remain in the same Integrated Report category consistent with Virginia's 2024 303(d) List as submitted." *Id.; see also,* EPA000026.

In its section addressing the streams on which it was not taking action, EPA noted in its approval rationale that a formal fish consumption advisory existed for PFOS on waters within the Chickahominy River watershed. EPA00034. EPA further explained that "the 2024 303(d) list does not reflect VDH's most recent actions because they occurred after the submission of the 2024 303(d) list . . ." It did not explain VDEQ's failure to conduct its own assessment of PFAS data from the Chickahominy watershed. EPA did not otherwise address PFAS data from the Chickahominy watershed and elsewhere. It did state that it "evaluated whether Virginia provided a technical, science-based rationale for any decisions not to use existing and readily available water quality-related data or information to make a WQS attainment status determination and concluded Virginia generally provided such rationale . . ." EPA0000031.

EPA's non-action on waters of the Chickahominy River and White Oak Swamp persisted until well after the filing of this case. On June 8, 2026, EPA finally took action on those waters. EPA0000001. It ultimately approved the non-listing of those waters as impaired. EPA0000003. EPA based its decision on the fact that the Virginia's 2024 Water Quality Assessment Guidance Manual did not provide a toxic human health criteria-based tissue value for PFOS. EPA0000004–5, 6. While it acknowledged that VDH did issue a fish consumption advisory in

May 2025, it did not find that advisory relevant because it occurred after VDEQ's submission of its Integrated Report. EPA0000006.

## ARGUMENT

### I. WILD VIRGINIA HAS STANDING TO PURSUE THIS ACTION

To have standing under the U.S. Constitution's Article III "case or controversy" requirements, a plaintiff must establish that he or she has suffered an actual or threatened "injury-in-fact" that is "fairly traceable" to the challenged action, and is likely to be redressed by a favorable decision of the court. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.,* 528 U.S. 167, 180–81 (2000). An organization may sue in a representational capacity when (1) at least one of its members would have standing to sue in his or her own right, (2) the organization's purposes is germane to the interests it seeks to protect, and (3) there is no need for the direct participation of the individual members in the action. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* 204 F.3d 149, 155 (4th Cir. 2000). In the environmental litigation context, the standing requirements are not onerous. *Am. Canoe Ass'n. v. Murphy Farms, Inc.* 326 F.3d 505, 517 (4th Cir. 2003).

Here, Wild Virginia satisfies standing requirements based on its members Rob Whitehead and Nancy Armour. Both have averred, through declarations, injuries-in-fact-that they have suffered and continue to suffer because of the contamination of Virginia's waters from PFAS. Ex. ¶¶ 1, 2. These injuries are fairly traceable to EPA's approval of Virginia's submission of the 2024 Integrated Report, which failed to properly consider PFAS pollution in the state's waters. EPA's refusal to act prolongs the time that affected waters will go without protection because there will be no TMDLs developed for waters not included on the 303(d) List and no management plan for waters not included on the 305(b) Report. 40 C.F.R. § 130.8(a). Moreover, the failure to include

waters affected by PFAS in the Integrated Report deprives these individuals of the ability to make informed decisions about waters in which they recreate, from which they eat fish and/or shellfish, and from which they receive their drinking water. *See, e.g.*, Ex. 2 at ¶¶ 3, 7, 10. A favorable resolution of this case is likely to redress Plaintiff's members injuries because, if EPA is ordered to act by disapproving Virginia's submission, it will be required to develop its own list of impaired waters. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).

Wild Virginia also meets the requirements for representational standing. As described in a letter from Wild Virginia to EPA "Wild Virginia is a Virginia nonprofit dedicated to protecting Virginia's wild places." EPA0005067; *see also, Ex. 2,* Armour Declaration. "Protecting water quality by preventing the release of per- and polyfluroalkyl substances (PFAS) is one of [its] organizational priorities." EPA0005067; *see also, Ex. 2,* Armour Declaration. Thus this lawsuit is germane to the purposes of the organization. Lastly, because this action is one for injunctive and declaratory relief and not for monetary damages, individual members are not required to participate in the action. *PIRG v. Powell Duffryn Terminals Inc*., 913 F.2d 64, 70 (3d Cir. 1990); *Ass'n. of Am. Railroads v. Hudson*, 144 F.4th 582, 590 (4th Cir. 2025) ("an action seeking prospective declaratory and injunctive relief – like the one before us today – is less likely to call for such particularized proofs, and is indeed the very type of relief for which associational standing was originally recognized.") (internal citations omitted)

## II. EPA'S APPROVAL OF VIRGINIA'S SUBMISSION OF ITS 2024 INTEGRATED REPORT WAS ARBITRARY AND CAPRICOUS

Courts must be "mindful that, pursuant to the APA, we must 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 256 (4th Cir. 2020) (quoting 5 U.S.C. § 706(2)(A) and citing *Sierra Club v. U.S.*

*Army Corps of Eng'rs*, 909 F.3d 635, 643 (4th Cir. 2018)). To survive arbitrary and capricious review, an agency must articulate "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 83 (4th Cir. 2020). Reasoned decision-making requires agencies to avoid implausible explanations. *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 365 (4th Cir. 2019). Agency actions are arbitrary and capricious when they run counter to the record or fail to address important aspects of the problem. *Sierra Club, Inc. v. U.S. Forest Serv.,* 897 F.3d 582, 594 (4th Cir. 2018); *Friends of Buckingham*, 947 F.3d at 87–90. "Record evidence contrary to an agency's conclusion requires further elaboration and must be grappled with." *W. Va. Dep't of Envtl. Prot.,* 64 F.4th at 502 (cleaned up).

EPA violated the APA in two respects. First, EPA had actual knowledge of the PFAS impairment of the Chickahominy River and White Oak Swamp, and yet it approved a Virginia 303(d) List that failed to include those waters as impaired. First Am. Compl., ECF No. 42, Second Claim for Relief, ¶¶ 81-93. Second, EPA had actual knowledge of the dangers of PFAS and yet failed to evaluate whether any Virginia waters beyond the Chickahominy River and White Oak Swamp should have been listed by VDEQ as impaired by PFAS. First Am. Compl., ECF No. 42, First Claim for Relief, ¶¶ 69-80.

A. EPA's approval of Virginia's 303(d) List, despite actual knowledge of stream impairments not documented on the list, was arbitrary and capricious.

The establishment of a list of impaired streams under CWA § 303(d) is the essential first step in achieving the Clean Water Act's goal to achieve and maintain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. at §§ 1251(a)(1), (2); 1313(d). The Act provides clear instruction that "[e]ach State shall identify those waters within its boundaries for which [effluent

limitations] are not stringent enough to implement any water quality standard applicable to such waters." *Id.* at § 1313(d). Despite actual knowledge that waters in the Chickahominy River and White Oak Swamp were not meeting water quality standards, on June 8, 2026 EPA approved Virginia's list without the inclusion of those waters. EPA0000001. EPA's rationale was based entirely on the fact that VDH—a separate entity from VDEQ, which was tasked with providing the list—did not issue a fish consumption advisory in time. EPA0000001–6. In its approval EPA ignored the fact that VDEQ had overlooked substantial evidence that PFAS was interfering with the designated uses of those waters. EPA also had to ignore the fact that a VDH *did, in fact*, issue a formal fish consumption advisory for PFAS more than a year before EPA's eventual approval. That approval was therefore arbitrary and capricious and must be overturned.

Virginia water quality standards are clear that waters within the state must support certain designated uses, including, "recreational uses, e.g. swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; wildlife; and the *production of edible and marketable natural resources*, e.g. fish and shellfish" 9 Va. Admin. Code § 25-260-10(A) (emphasis added). Additionally, narrative criteria preclude pollution "in concentrations, amounts, or combinations which contravene established standards, or interfere directly or indirectly with designated uses of such water *or which are inimical or harmful to human, animal, plant or aquatic life*. *Id.* § 25-260-20(A) (emphasis added). The records shows that portions of the Middle Chickahominy Creek and White Oak Swamp failed to meet those standards and that substantial uncontroverted evidence demonstrated that fact well before Virginia submitted its 2024 Integrated Report.

Instead of examining the data and information before it, VDEQ insisted on waiting on a substantially delayed and mere procedural formality before it would recognize waters as

impaired for fish consumption. Any reasonable assemblage and evaluation of existing evidence at the time VDEQ submitted its report on March 28, 2025 would have demonstrated that these streams were impaired. First, as pointed out by Wild Virginia, state officials had warned since 2021 that "sensitive populations (e.g. children and pregnant women) [should] avoid eating fish from the Middle Chickahominy River watershed until EPA finalizes recommendations to protect human health from exposure through fish ingestion." EPA00004121. That warning was repeated in the study of the PFAS in the Middle Chickahominy by the VDEQ and VDH, published on December 15, 2022. EPA0005108, EPA0005113–5114. Those warnings alone are enough to show that waters were not meeting the use of the "*production of edible and marketable natural resources*, e.g. fish and shellfish" as required. 9 Va. Admin. Code § 25-260-10(A).

Moreover, there is no dispute that the fish tissue data, upon which these warnings were based, were available before the report was filed and in the time-frame being considered by VDEQ. Fish tissue samples with high levels of PFAS collected in 2021 and 2022 from the Chickahominy River watershed were included in Wild Virginia's comments to both state and federal agencies. EPA0004121–4124 (comments to VDEQ); EPA0005071–5085. They are also included in raw form in the administrative record. EPA0005218.

While there was not, at the time of VDEQ's report, submission a numerical criterion for PFAS in fish tissue, regulations are clear that it is not just numeric standards that must be protected. 40 C.F.R. § 130.7(b)(3) (specifying that applicable water quality standards include "numeric criteria, narrative criteria, waterbody uses, and antidegradation requirements.") State and federal guidance reiterate this. *See* VDEQ 2024 Water Quality Assessment Guidance Manual at 6, EPA0004837 ("[a]ssessment data are compared to both numeric and narrative criteria established for Virginia's designated uses and promulgated in its water quality standards"); EPA,

"2024 Integrated Report Memorandum: Information Concerning 2024 Clean Water Act Sections 303(d), 305(b) and 314 Integrated Reporting and Listing Decisions," EPA0005487. ("[i]t is important to note that the lack of an assessment methodology. . . does not negate the requirement, in developing the CWA 303(d) list, to assemble and evaluate all existing and readily available water quality-related data and information and use such data and information to determine if applicable [water quality standards] (including numeric and narrative criteria) are attained.")

Finding a science-backed threshold upon which to evaluate the existing fish tissue data in the Chickahominy River and White Oak Swamp would not have been difficult. In fact, the Administrative Record contains numerous such examples. The federal Agency for Toxic Substances and Disease Registry ("ATSDR") published its guidance for fish consumption in 2018. EPA0005190. The Great Lakes Consortium published a PFAS specific fish tissue consumption guidance (based on ATSDR guidance) in November 2019. EPA0005225. By August 21, 2024—months before Virginia's submission of its Integrated Report—Virginia had promulgated its own policy (also based on ATSDR guidance). EPA0005061–5065.

EPA, in its own memorandum explaining how it would review 2024 Integrated Reports during the 2024 cycle, stated repeatedly that it would "evaluate whether a state, territory, or authorized tribe provides a technical, science-based rationale for decisions not to use data or information." EPA, "2024 Integrated Report Memorandum: Information Concerning 2024 Clean Water Act Sections 303(d), 305(b) and 314 Integrated Reporting and Listing Decisions," at 8 n.15, 9, 10 n. 22, 14, 15 n. 36, 17, 29. EPA0005487. The explanations offered by Virginia, however, simply point out 1) a legislative initiative to "create a cost-effective solution to PFAS in the drinking water;" 2) draft EPA water quality criteria for public water supplies; and, 3) an "initial fish consumption advisory guideline" released by VDH. EPA0004126. Virginia implied

that it would not consider any of those sources, because of their draft nature. It did not, however, provide any "technical or science-based rationale" for why those or other sources of information in the record could not be used to evaluate PFAS fish tissue data. Where an agency has failed to appropriately provide rationale for excluding information during the assemblage of the 303(d)list, the action is arbitrary and capricious. *Northwest Envt'l Advocates v. U.S. Environmental Protection Agency,* 745 F.Supp.3d 1150, 1185 (D. Or. 2024). While guidance is not binding "when an agency changes course it must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not causally ignored, and that failure to do so constitutes an inexcusable departure that renders the challenged action arbitrary and capricious." *Pharmaceutical Coal. for Patient Access v. U.S.*, 2024 WL 187707 at *19 (E.D. Va. Jan. 17, 2024) (quoting *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1124–25 (D.C. Cir 2003) (cleaned up).

EPA was initially hesitant to approve Virginia's submission without the designation of waters in the Chickahominy River and White Oak Swamp as impaired from PFAS. On April 17, 2025 EPA's Region 3 Water Director emailed VDEQ and explained "[i]t is my understanding that VDEQ didn't provide a scientific, technical justification for not using the data for the issue we spoke about this morning." EPA0005468. The data in question is obviously fish tissue data for the Chickahominy and White Oak because the email later references the "delay in the advisory," and other emails indicate correspondence between agency's over the delay in a fish tissue advisory on those waters. *See, e.g.* EPA0005431–5433; EPA005427; EPA0005455; EPA0005462–5466. On July 28, 2025, EPA attempted to skirt the issue by generally approving Virginia's submission, except for the obviously impaired waters in the Chickahominy River and White Oak Swamp. EPA0000414. It was only after the filing of this case, alleging that Virginia

had failed to meet its mandatory duty by taking "no action" on those waters, that EPA reversed course and approved the list in full—without recognizing impairment of Chickahominy and White Oak for PFAS. EPA000001.

By the time EPA finally took action on the full list it had even more information confirming the impairment of the Chickahominy River and White Oak Swamp. This included a formal issuance of fish consumption advisory from VDH and a toxicology report. EPA0005119–5123; EPA0005219–5220; *see also,* EPA0005223–5224, EPA0005462. EPA explained its action by relying on the lack of a toxic human health criteria-based tissue value for PFOS, which it contended made the issuance of a fish consumption advisory impossible. That explanation, particularly in light of the availability of the underlying data in the record and multiple credible assessment tools, is not a "technical, science-based" rationale for exclusion. It is further contrary to EPA's guidance that "lack of an assessment methodology . . . does not negate the requirement, in developing the CWA 303(d) list to assemble and evaluate all existing and readily available water quality-related data and information." U.S. EPA, "2024 Integrated Report Memorandum: Information Concerning 2024 Clean Water Act Sections 303(d), 305(b) and 314 Integrated Reporting and Listing Decisions," at 15. EPA0005487. Finally, the action was arbitrary and capricious because EPA knew it was approving a list of impaired streams that did not include streams that obviously interfered with Virginia's designated uses.

B. EPA's FAILURE TO EVEN ADDRESS VIRGINIA'S DISREGARD OF OTHER PFAS DATA WAS ARBITRARY AND CAPRICOUS

While portions of the Chickahominy River and White Oak Swamp are obviously impaired for PFAS, they are likely not the only waters in Virginia that fail to meet water quality standards because of those chemicals. Neither Virginia nor EPA attempted to explain the disregard for PFAS water column data from across the state. In its comments, Wild Virgina

alerted the agencies to 8,793 PFAS data from 83 different sampling sites that were collected within the period covered by the 2024 Integrated Report. EPA004120. The record shows that this data consists not only of PFAS data, but of water column data and sediment data. EPA0005107; EPA0005258. Examining just one form of PFAS, PFOS, Wild Virgina found that of 181 samples in the relevant data set, 22% exceeded the EPA drinking water standard. EPA0004124.

Water column and sediment data from Virginia cannot legally be ignored. Neither can fish tissue data from other bodies of water apart from the Chickahominy River and White Oak Swamp. Regulations are clear that states "are required to assemble and evaluate *all* existing and readily available water quality-related data and information" 40 C.F.R. § 130.7(b)(5) (emphasis added). This evaluation must be performed to protect not only numeric criteria, but also "narrative criteria, waterbody uses, and antidegradation requirements." 40 C.F.R. § 130.7(b)(3). While recognizing legislative intent to ensure "cost-effective solution to PFAS in drinking water" and EPA's establishment of drinking water regulations for PFAS, Virginia wholly failed to assemble and evaluate data to assess impairment of waters that serve as public water supplies. EPA0004126; *see also,* 9 Va. Admin. Code § 25 Part IX (listing river basin tables including waters used for public water supply). Similarly, despite recognizing that PFAS posed potential human health effects, EPA0004439, Virginia made no attempt to evaluate data to assess whether there were waters that failed to meet the state narrative water quality standard prohibiting pollution in concentrations or amounts "which are inimical or harmful to human, animal, plant or aquatic life." 9 Va. Admin. Code § 25-260-20(A).

In addition to the rationale provided in its response to comments, other record documents indicate that VDEQ was well aware that at least some PFAS compounds could affect designated

uses and water quality standards unrelated to fish consumption. A December 19, 2022 workgroup including representatives from the DEQ Office of Ecology, the VDH Office of Environmental Health and the VDH Office of Drinking water, developed screening thresholds for four forms of PFAS. EPA0005390–0005395. Those screening thresholds were related not only to fish consumption but for drinking water and surface water recreation as well. EPA0005393. Thus, Virginia recognized at least the potential for PFAS chemicals to interfere with other designated uses, but it did nothing to evaluate the PFAS data in its possession to assure the protection of such uses.

EPA was also well aware of the dangers of PFAS. On April 26, 2024, EPA promulgated a PFAS National Primary Drinking Water Regulation. 89 Fed. Reg. 32,532. That regulation was the result of a "data driven review" of the "best available science." *Id.* EPA recognized that PFAS bioaccumulate in the blood and tissue of both aquatic and terrestrial organisms. *Id.* at 32,536. The agency found a range of negative human health effects associated with PFAS, including: liver cell death, low birth weight, changes in hormone levels, and negative effects on kidney function, immune system response, cholesterol levels, reproduction, and an increase risk of cancer. *Id.* at 32,537. EPA further recognized that PFAS could be harmful at very low levels. It established maximum contaminant levels (accounting for economic consideration of treatment) ranging from 4 to 10 nanograms per liter for six separate PFAS compounds. *Id.* at 32,532. EPA found that for two PFAS, PFOS and PFOA, there was no evidence of a safe level of exposure that would prevent appreciable cancer risks. *Id.* at 32,564.

In its approval of Virginia's Integrated Report (either its initial approval of waters apart from the Chickahominy River and White Oak Swamp or its June 8, 2026 approval of the full list) EPA did not address this data at all. EPA's position appears to be that the only water quality standard

applicable for PFAS is the consumption of fish. That position is contrary to the record and conflicts with the review of best available science that EPA, itself undertook in establishing PFAS drinking water standards. Agency actions are arbitrary and capricious when they run counter to the record or fail to address important aspects of the problem. *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 594 (4th Cir. 2018). A reviewing court must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action. *Cape Fear River Watch v. United States Army Corps of Eng'rs*, No. 7:21-CV-138-FL, 2022 WL 4468268, at *6 (E.D.N.C. Sept. 26, 2022). An agency decision is arbitrary and capricious if "the agency ... entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Colorado Env't Coal. v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999) (quotations omitted). Here, EPA entirely failed to consider an important aspect of the problem: PFAS are a known contaminant in Virginia's waters, raw PFAS data is in the hands of the experts, and yet the problem is effectively ignored.

## CONCLUSION AND RELIEF REQUESTED

The record amply demonstrates that EPA not only knew about the impairment of the Chickahominy River and White Oak Swamp, but it had significant concerns. Given that fact, EPA's approval of a 303(d) list that ignores the PFAS impairment of those streams was arbitrary. Even more broadly, EPA ignored a raft of available PFAS data from across the state. Both of those failures are independently arbitrary and capricious. Accordingly, Wild Virginia respectfully requests that summary judgment be granted. The relief requested is a declaration that EPA's actions violated the APA and vacatur of EPA's actions approving Virginia's 303(d) List.

Dated: September 25, 2026

Respectfully submitted,

s/ Isak Howell

Isak Jordan Howell (VSB NO. 75011)
Appalachian Mountain Advocates
P.O. Box 2186
Roanoke, Virginia 24009-2186
isak@howell-lawoffice.com
(540) 998-7744

Claire Marie Horan (VSB No. 95386)
Appalachian Mountain Advocates
P.O. Box 403
Charlottesville, Virginia 22902
choran@appalmad.org
(907) 687-8561

Michael Becher (not admitted in Virginia;
Pro Hac Vice motion pending)
Appalachian Mountain Advocates
P.O. Box 11571
Charleston, WV 25339
mbecher@appalmad.org

*Counsel for Wild Virginia*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**AT RICHMOND**

**WILD VIRGINIA, INC.,**

**Plaintiff,**

**v.** **CIVIL ACTION NO. 3:25-cv-1043**

**UNITED STATED ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of U.S. Environmental Protection Agency; AMY VAN BLARCOM-LACKEY, in her official capacity as Regional Administrator for U.S. Environmental Protection Agency Region III,**

**Defendants.**

**CERTIFICATE OF SERVICE**

I, Isak Howell, do hereby certify that on September 25 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system.

s/ Isak Howell

Isak Jordan Howell (VSB NO. 75011)
Appalachian Mountain Advocates
P.O. Box 2186
Roanoke, Virginia 24009-2186
isak@howell-lawoffice.com
(540) 998-7744