**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND**

**WILD VIRGINIA, INC.,**

**Plaintiff,**

**v.** **CIVIL ACTION NO. 3:25-cv-1043**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of U.S. Environmental Protection Agency; AMY VAN BLARCOM-LACKEY, in her official capacity as Regional Administrator for U.S. Environmental Protection Agency Region III,**

**Defendants.**

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

EPA makes two primary arguments in its memorandum. First, it argues that this Court has no jurisdiction to rule on Plaintiff's Count I, because EPA's July 2025 approval of Virginia's 303(d) list was not a final agency action. Second, it argues that while the Court has jurisdiction over Count II, the Court should find that EPA's approval of Virginia's 303(d) list was reasonable because the Virginia Department of Environmental Quality ("DEQ") had no knowledge of a Virginia Department of Health (VDH") fish advisory at the time it created its list.

EPA is wrong on both counts. As to the first count, this Court has jurisdiction, because EPA's July 2025 approval was a complete, final agency action subject to judicial review, and it clearly violated the agency's duty to approve or disapprove of a state's list, rather than cherry-picking particular pollutant-waterbody combinations. As to Count II, EPA is wrong; EPA

approved of DEQ's failure to actually analyze its own PFAS data for evidence of impairment, rather than waiting for declaration from another agency that does not make Clean Water Act determinations at all. EPA makes a final request that this Court should simply wait for Virginia to do a better job in the next round. Those arguments should be rejected.

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS**

Plaintiff does not directly dispute the statements of fact proffered by EPA, but provides the following additional facts, which are important to the Court's understanding of the record and the context of this action.

1. Plaintiff Wild Virginia commented on Virginia DEQ's submission of the 2024 Virginia 303(d) List on May 22, 2024. EPA0004117. That comment letter alerted DEQ to an abundance of PFAS data that had been collected by the agency but not analyzed for purposes of the 303(d) List submission. EPA0004120.
   A. Specifically, Wild Virginia noted that according to the DEQ's Statewide Sampling Dashboard there were 29,523 pieces of PFAS data collected by the agency. EPA004120. Based on a limited review Wild Virginia compiled a total of "8,793 pieces of PFAS data from 83 separate sampling sites" for the period covered by the 303(d) List submission, "including results from analysis of surface water, sediments, and fish tissue."
   B. Wild Virginia pointed DEQ to high levels of PFOS, a variety of PFAS, in fish tissue from the Chickahominy River watershed and White Oak Swamp. EPA0004121–4124. Wild Virginia also reminded the agency of a warning promulgated by Virginia officials in 2022: "It is recommended that sensitive populations (e.g. children and pregnant women) avoid eating fish from the Middle

Chickahominy River watershed until EPA finalizes recommendations to protect human health from exposure through fish ingestion." EPA0004121.

C. Wild Virginia also conducted its own analysis of PFOS water column data collected by the agency and commented that 22% of the samples exceeded EPA's drinking water standard. EPA0004124.

2. Virginia DEQ submitted the final version of Virginia's 303(d) List to EPA on March 28, 2025. While the submission noted PFAS as an "emerging contaminant" and recognized that DEQ had been collecting PFAS data, it did not explain analyses of that data. EPA0004439–4441. Instead, it noted legislative attention to PFAS, EPA0004440; described a "risk assessment" by VDH, including draft consumption advisory guideline for PFOS; recognized EPA draft criteria to protect water supplies; and pointed the public to an online "PFAS dashboard." EPA0004440–4441.

3. The record contains multiple sources that were promulgated prior to the submission of the 303(d) List that could have been used to evaluate PFAS data. In 2018, the Agency for Toxic Substances and Disease Registry issued guidance for assessing PFAS in fish tissue and in other aquatic organisms. EPA0005190. Other states, as noted by Wild Virginia and the Great Lakes Consortium, had established thresholds for PFOS that justify fish consumption advisories. EPA0004122, EPA0005227. In addition, the policy providing thresholds of PFOS in fish tissue that *should* result in a fish consumption advisory, was in place by at least August 21, 2024. EPA0005061–5066. Finally, since at least December 9, 2022, a workgroup consisting of representatives from the DEQ and VDH offices had proposed PFAS values "to be applied to surface waters designated as Public Water Supply." EPA0005390, EPA0005393.

4. On April 17, 2024, the Director of the Water Division at EPA's Region 3 informed VDEA that it was her "understanding that [VDEQ] didn't provide a scientific justification for the issues we discussed this morning." EPA0005468. The email was obviously in reference to fish tissue data from the Chickahominy River and/or White Oak Swamp because it referenced the "delay in the advisory." *Id.* Numerous previous emails had been exchanged about the status of such an advisory for fish consumption in the Middle Chickahominy River and White Oak Swamp. *See e.g.* EPA0005431–5433; EPA005427; EPA0005455; EPA0005462–5466.
5. On July 28, 2025 EPA issued a general approval of DEQ's submission of Virginia's 303(d) List but purported to take "no action" on certain waters in the Chickahominy River watershed and White Oak Swamp. EPA0000014; *see also,* EPA0000026.
    a. The approval letter noted that despite the fact that no waters were listed for PFAS impairment, Virginia had "taken steps to collect and evaluate water quality related information" concerning PFAs in the Middle Chickahominy. EPA0000034. The letter did not describe efforts to evaluate PFAS data in the Chickahominy Creek and simply expressed its hope that such data would be evaluated in the next cycle. *Id.*
    b. The approval letter contained no information indicating that future action would be taken by EPA with respect to streams in the Chickahominy River watershed or White Oak Swamp, instead providing that "those water-body pollutant combinations will remain in the same Integrated Report category consistent with Viginia's 2024 303(d) list as submitted." EPA0000014.

c. The approval letter did not indicate any future action to be taken by EPA on other waters encompassed by the 2024 303(d) List. EPA0000014–15.

6. EPA's supplemental action on June 8, 2026, did not apply new rationale for waters apart from those in the Chickahominy River watershed and White Oak Swamp, upon which it had previously purported to take "no action." EPA0000001–06. It incorporated its July 28, 2025 rationale by reference and added supplemental rational justifying the new action on Chickahominy River watershed and White Oak Creek waters. EPA0000003. ("EPA incorporates by reference its Decision Rationale as sent to VADEQ on July 28, 2025, and, *with respect to the Table A segments, adds the following,"*)

   a. EPA's new rationale did not address the existence of Virginia's own policy for issuing fish tissue consumption advisories, which established clear thresholds, which had been in place since August of 2024. EPA0005061–5066.

   b. EPA did not address other sources of information upon which Virginia could have evaluated PFAS fish tissue data. *See e.g.* EPA0005190; EPA0004122, EPA0005227.

   c. EPA did not address other forms of PFAS data apart from fish tissue data. EPA0000001–06.

## STANDARD OF REVIEW

Agency action is arbitrary and capricious unless it is "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and its action cannot stand if the agency "failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). This review is deferential, but it is "searching and careful," *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 270 (4th Cir. 2018), and the Court "will not 'rubber stamp' an agency's decision," *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 501 (4th Cir. 2023). Simply reciting a conclusion does not explain it. *See Sierra Club v. Interior*, 899 F.3d at 294.

## ARGUMENT

### I. This Court has jurisdiction over EPA's July 2025 Approval, and Count I is not moot.

#### a. EPA's July 2025 Approval was a final agency action by every measure, a fact not changed by later supplementation.

For an administrative decision to be final, it must (1) "mark the consummation of the agency's decision making process," and, (2) be a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). In that case, the Court ruled that an approval of a Clean Water Act Jurisdictional Determination approval by the U.S. Army Corps of Engineers was certainly a final agency action. *Id.* That was true even though the agency had a right to revise the approval for a five-year period. *Id.*

EPA's July 2025 approval is also certainly a final agency action, as it is an agency approval, much like the one analyzed by the Court in *Hawkes*. First, the approval marks the consummation of the EPA's review of Virginia's 303(d) List. EPA's own moniker for the document could not be clearer: "EPA's Approval of Virginia's 2024 Clean Water Act Section

303(d) List." EPA0000015; EPA0000026. But evidence of the completion of the action extends well beyond the title. This is a formal document sent by the EPA's Water Division Director to the DEQ Water Planning Division director, including a full rationale for the decision, and including no caveats that the action is tentative or interlocutory. EPA0000014-15; EPA0000026-36. The EPA clearly states that its review of Virginia's submission is complete, that it commends Virginia on its work, it looks forward to the 2026 process, and the approval letter includes no dates or descriptions of any further action that EPA intends to take on the 2024 303(d) list. EPA0000014. Any reasonable reader of that document would be compelled to conclude that the document represents the final word by EPA on Virginia's 303(d) List.

It is true that the document asserts that EPA takes "no action" on waters possibly affected by PFOS in the Chickahominy watershed. That element cannot defeat the finality of the EPA action. As in *Hawkes*, a right to revise at a later date does not obviate the approval itself. *Hawkes*, 578 U.S. at 597. EPA makes no commitment or even suggestion that further action will be needed to achieve completion of the action. It states that "until such time" as a revision is made, the "no action" waters will be treated as unlisted, but the "such time" is not a commitment to do anything at all, and "such time" may never arrive. EPA0000014. The only reasonable reading of the document is that taking "no action" on certain waters is part and parcel of the final agency action.

As to the second *Hawkes* element, the EPA document makes clear that legal consequences will flow from the July 2025 Approval. First, as to every item of the list other than the Chickahominy watershed, there is no doubt that Virginia's 303(d) List is approved as written. Second, as to the Chickahominy watershed, "those waterbody-pollutant combinations will remain in the same Integrated Report category consistent with Virginia's 2024 303(d) List as

submitted." EPA0000014. In other words, no further action is needed for those streams to remain unlisted as submitted by Virginia. Virginia did not list the streams as impaired by PFOS, and EPA clearly states the streams will remain that way, and that is made clear in the July 2025 Approval.

In its argument, EPA calls the July 2025 Approval a "classic non-final agency action." EPA Mem. at 12. Certainly a "classic" non-final action would have many parallel precedents. However, EPA fails to cite even one example of an EPA Approval that is somehow non-final. EPA cites only *Mashni v. U.S. Army Corps of Engineers*, 535 F. Supp. 3d 475 (D.S.C. 2021). That case, however, is fundamentally different. It does not involve non-final 303(d) list approvals at all, and it does not even involve Section 303(d) of the Clean Water Act. Rather than issuing a clear and explicit "Approval," as EPA did here (EPA0000014; EPA0000026), the U.S. Army Corps of Engineers in *Mashni* issued an explicit *deferral*. The Corps' letter, on its face, was "deferring action" on a jurisdictional determination as to whether certain specified waters were within federal Clean Water Act jurisdiction. 535 F. Supp at 483.

There is no such deferral here by the EPA. EPA expressly states that Virginia's submission "has met the requirements of Section 303(d) of the Clean Water Act" (EPA0000036); that EPA has conducted its "complete review" (EPA0000026) that the "Rationale for EPA Approval" of the list is complete (EPA0000026); and EPA expressly looks forward to working on the 2026 process (EPA0000014). Absolutely no further work or action on the 2024 is identified in the Approval. There is no deferral of any decision, only an express decision to take "no action" on certain waters as part of the final Approval. The argument that the 2025 Approval is a "classic non-final agency action" is just that, a litigation concept that post-dates the document itself. The document itself is a completed EPA Approval, as it says on the face of the document. This Court, therefore, has complete jurisdiction.

**b. Count I is not moot, and would be subject to the "capable of repetition, yet evading review" exception even if it was moot.**

EPA also argues that Plaintiff's Count I claim is moot, pointing to EPA's June 2026 second Approval of Virginia's 2024 303(d) List, which removed the "no action" component and simply approved the full list as submitted. EPA Mem. at 12.

EPA is wrong. EPA's June 2026 Approval is, by its own terms, a "supplement" to the action taken in 2025. EPA0000002. It, therefore, adds to the record but does not purport to supersede or vacate the July 2025 Approval. It does not even purport to offer new rationale for waters beyond beyond those of the Chickahominy River watershed and White Oak Swamp, on which the supplemental action was taken. EPA0000003 (incorporating the July 28, 2025 rationale by reference and limiting new rationale to those waters).

EPA argues that "vacating" an earlier action creates mootness, because the earlier action is then no longer effective. EPA Mem. at 13 (citing *Anderson v. U.S. Dep't of Hous. & Urb. Dev.*, 731 F. Supp. 3d 19, 31 (D.D.C. 2024)). That case reveals EPA's problem. There has been no vacatur, nor any repudiation of the July 2025 Approval. EPA, by its own words, has issued a supplement, not a vacatur. It has added a new chapter, but not a replacement. The 2026 Approval even refers the reader back to the 2025 Approval "for more on this topic [of fish tissue contamination]." EPA0000005. With respect to waters other than those of Chickahominy Creek and White Oak Swamp, the June 2026 Approval—by its own terms—does not displace the prior decision. In prefacing the new rationale for waters of Chickahominy Creek and White Oak Swamp, EPA states, "EPA incorporates by reference its Decision Rationale as sent to VADEQ on July 28, 2025, and, *with respect to the Table A segments, adds the following,"* EPA0000003. EPA's action does not disturb the prior decision on other waters, does not purport to add new rationale for the non-listing of other waters, and by its own language is limited to the new action

of approving the non-listing of stream segments in the Chickahominy River and White Oak Swamp.

*Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66 (D.C. Cir. 2011), which is cited in the *Anderson* cased relied upon by EPA, vividly illustrates the point. There, the Bureau of Land Management's 2008 Record of Decision "superseded the 2000 Record of Decision in its entirety." *Id.* at 79 (cleaned up). Therefore, the original Record of Decision "disappeared into the regulatory netherworld." *Id.* That is very clearly not what happened here. A supplement is not a vacatur. A supplement is additive; both the original and the supplement remain. A vacatur renders the earlier document a nullity. EPA's argument fails by the measure of its own authorities.

Even if there were a viable mootness argument, this case would be subject to the "capable of repetition, yet evading review" exception. That exception applies if the challenged conduct "is in its duration too short to be fully litigated prior to cessation or expiration" and "there is a reasonable expectation that the same complaining party will be subject to the same action again." *Lancaster v. Sec'y of Navy*, 109 F.4th 283, 291 (4th Cir. 2024). EPA is already pointing to the 2026 list to avoid a ruling in this case. EPA Mem. at 17. If not ruled upon in this action, EPA could always argue on summary judgment that a new, soon-to-issued approval of a new list will moot the earlier action. That cycle could repeat itself endlessly. That is the reason for the exception to the mootness doctrine, and it should apply here is any merit is found to the mootness contention.

## II. EPA's approval was not reasonable because DEQ possessed PFAS data beyond fish consumption advisories, and did nothing substantive with it, thereby failing in its duty to evaluate its own data.

EPA concedes this Court's jurisdiction as to Plaintiff's Count II, which challenges EPA's June 2026 Approval, but argues that the approval was reasonable and entitled to deference. EPA's argument does not survive scrutiny, however. DEQ had a legal duty to evaluate the PFAS data it gathered. EPA has recognized that duty in previous 303(d) list cases. EPA has even warned Virginia that the lack of an established methodology cannot eliminate a state's duty to both assemble *and* evaluate pertinent data. Virginia did not do that here.

EPA argues that "[a]s described in EPA's June 2026, supplemental decision, first, Virginia *assembled and evaluated* all existing and readily available water-related data and information related to PFAS in the Middle Chickahominy and White Oak Swamp in the established data period". EPA Mem. at 14 (emphasis added). Plaintiff agrees that Virginia certainly assembled PFAS data, and such data is included in the record. EPA refers to Virginia's "gathering PFAS sampling data" and "extensive monitoring and source characterization." EPA Mem. at 14-15. However, the reader searches in vain for any EPA citation to DEQ's actual evaluation of that gathered PFAS data. Nowhere does EPA cite a document in the record showing that Virginia actually *evaluated* its PFAS data for the effect of that pollution on impairments apart from fish consumption, such as drinking water supplies, wildlife, swimming, or aquatic species. Instead, EPA changes the topic to the fish consumption advisory, noting that it did not exist when Virginia was assembling its own 303(d) List. That argument misses the point. The record is clear that DEQ gathered its own PFAS data, including water column data and sediment data. EPA005258 (Wild Virginia comments alerting DEQ to 8,793 instances of PFAS data from 83 different sampling sites, all within the relevant reporting period); see also, EPA0004124) (Wild

Virginia comments showing that water column data for PFOS, a single form of PFAS, exceeded drinking water standards 22% of the time.) EPA relies on "gathering" and "monitoring" but failed to cite even one instance of DEQ's actual evaluation of the data it gathered.

EPA's Approval is focused entirely on the fish consumption advisory. That is insufficient. Virginia's legal responsibility under the Clean Water Act extends far beyond assessing whether human consumption of game fish is affected. Water quality standards consist, *inter alia*, of the "designated uses" of a state's waters and "the water quality criteria for such waters based upon such uses," and shall be such to "protect the public health or welfare, enhance the quality of water and serve the purposes of [the Act.]" *Id.* at § 1313(c)(2)(A); 40 C.F.R. § 130.2(d). These "designated uses" consist of purposes a section of waters must support, such as fishing, recreation, aquatic life, or drinking water, to name a few. Water quality standards established to ensure that the designated uses are supported include both narrative and numeric criteria. 40 C.F.R. § 130.7(b)(3).

Virginia's designated uses applicable to all state waters include "recreational uses, e.g. swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; wildlife; and the production of edible and marketable natural resources, e.g. fish and shellfish" 9 Va. Admin. Code § 25-260-10(A). Nowhere in the record does Virginia evaluate its own data as to how PFAS will affect, for example, public swimming, the health of indigenous aquatic life, or the production of marketable fish and shellfish. That is the failure that EPA glosses over.
Fish consumption advisories are issued pursuant to a different law, Virginia Code § 32.1-248.01, and are governed by standards entirely divorced from the Clean Water Act. Consumption advisories are governed by health-based concerns regarding the ingestion of certain game species

by recreational anglers. The fish consumption analysis is not tethered to the Clean Water Act, to a state's designated uses, or to impairment under Section 303(d). The advisory, therefore, is not a substitute for evaluation of data to determine 303(d) impairment. Assessment guidance from DEQ makes clear that for 303(d) List purposes "[a]ssessment data are compared to both numeric and narrative criteria established for Virginia's designated uses and promulgated in its water quality standards." VDEQ Guidance Memo No. GM23-2002, "VDEQ 2024 Water Quality Assessment Guidance Manual" at 6, EPA0004837. Nowhere has EPA demonstrated that DEQ compared its PFAS data to both numeric and narrative criteria established for Virginia's designated uses.

EPA relies chiefly on *Potomac Riverkeeper v. Wheeler,* 381 F. Supp. 3d 1, 13-16 (D.D.C. 2019) as instructive. EPA Mem. at 16. Plaintiff agrees that the case is instructive, because it demonstrates the true meaning of "evaluate" in determining impairment, the very duty that DEQ failed to fulfill. In *Wheeler*, the court was clear that a "state therefore cannot simply ignore available data; it must, at a minimum, assess the data's reliability and significance." *Id.* at 14. The case involved algal blooms in the Shenandoah River and potential impairment for the designated use of recreation. EPA actually conducted its own "detailed analysis" of the algal blooms, and shared that analysis with DEQ. The two agencies then had "extensive" substantive discussions about the algal bloom data, which led to a DEQ determination that certain segments were not impaired but must be prioritized for follow-up monitoring. *Id.* at 15, 8. The Court found that "[t]his record of collecting, responding to, analyzing, discussing, and acting on the plaintiffs' data clearly establishes that DEQ 'assembled and evaluated' that data as required by 40 C.F.R. § 130.7(b)(5)." *Id.* at 16. This holding demonstrates the problem with EPA's argument in this case: the list here stops at "collecting." EPA has not shown any document in which DEQ has actually

analyzed the PFAS data that it collected. For fish tissue data, it points to the potential for fish consumption advisories to trigger impairment designations in the future. For other forms of data and for other impairments, EPA is completely silent. Far from the extensive back-and-forth between the agencies and the public commenters, the record in this case is devoid of any analysis of PFAS data by either DEQ or EPA.

## III. The Potential for Listing Based on Future Advisories Does Not Relieve DEQ of its Duty to Evaluate the Fish Tissue Data in Its Possession, nor EPA to ensure that the state agency met that duty.

EPA does not dispute three important facts: 1) the fish tissue data underlying fish consumption advisories was available from the applicable reporting period; 2) fish consumption warnings based on that data were issued in 2021 and 2022; and, 3) the Virginia Department of Health (VDH) issued formal fish consumption advisories in May 2025, prior to any EPA action on the 303(d) List. First, fish tissue data showing elevated levels of PFAS in the Chickahominy River and White Oak Swamp were collected in 2021 and 2022; and Wild Virginia informed DEQ of those facts. EPA0004121–4124; *see also,* EPA0005218. As early as 2021, Virginia officials warned that "sensitive populations (e.g. children and pregnant woman) [should] avoid eating fish from the Middle Chickahominy River watershed until EPA finalizes recommendations to protect human health from exposure through fish ingestion." EPA0004121. That warning was repeated in 2022. EPA0005108, EPA0005113–5114. On May 9, 2025, VDH did issue a formal fish tissue consumption advisory. EPA0005219–5220; *see also,* EPA0005223–5224. That was months before EPA's initial "non action" on Chickahominy and White Oak water, and more than a year before EPA's approval of DEQ's submission that did not list those waters.

As described in the prior section, *Wheeler* demonstrates that "assemble" and "evaluate" are two distinct, mandatory duties. A state must, at a minimum, assess the reliability and significance of the assembled data. DEQ did assemble PFAS fish tissue data in the Chickahominy River and White Oak Swamp, but never evaluated that data. Instead, DEQ punted to VDH, and EPA approved that punt. Again, EPA's argument fails by the measure of its own authorities. EPA did not meet the test set in *Wheeler*, and there is no record here of the inter-agency "extensive discussion" and "detailed analysis" of algal blooms that were entitled to judicial deference in that case. *Id.* at 8, 15. Had such interagency discussion and analysis occurred, the impairment of waters in the Chickahominy River and White Oak Swamp would have been obvious. The data was available, warnings had been issued, and by the time of any EPA action, formal fish tissue consumption advisories had been issued.

The record shows that the only agency interaction with fish tissue data was not analysis, but waiting on VDH. *See e.g.* EPA0005431–5433; EPA005427; EPA0005455; EPA0005462–5466. EPA and DEQ had at their disposal multiple tools that would have made such analysis possible. Since 2018, there has been guidance from the federal Agency for Toxic Substances and Disease Registry for assessing PFAS in fish and other aquatic organisms. EPA0005190. Other states, as noted by Wild Virginia, and the Great Lakes Consortium have established levels of PFOS in fish that call for fish consumption advisories. EPA0005084; EPA0005272. Indeed, Virginia had established guidance for PFOS levels in fish that should trigger a fish consumption advisory by at least August 21, 2024—several months before VDEQ finalized its 2024 Integrated Report. EPA0005061–0005066. Instead of using any of these tools for actual "analysis" or "evaluation" of PFAS data DEQ and EPA decided to do nothing and justify their actions on the lack of a formal advisory.

Notably, however, in *Wheeler*, EPA actually cautioned Virginia that "'the lack of a formalized methodology' for handling particular kinds of data 'is not a basis for a state to avoid evaluating data or information when developing its 303(d) list'". *Id.* at 9-10. That is precisely the point here. The lack of formalized methodology as to PFAS data (or the lack of a fish consumption advisory issued by a different agency) cannot excuse the DEQ's legal duty of evaluation for purposes of the 303(d) list. The EPA had it exactly right in *Wheeler*, but it is running away from that duty in this case.

EPA concludes its argument by urging this Court to just wait until the next round of 303(d) lists. EPA argues that Virginia could always use new information "in future lists." EPA Mem. at 17. EPA points to the expectation that Virginia could use the fish consumption advisory in the 2026 303(d) list. Given the two-year cycle of 303(d) list submissions and approvals, that argument will always be available. If accepted, it would always defeat judicial review. Certainly Virginia may actually evaluate its PFAs data the next time around, and Plaintiff shares EPA's hope in that regard. EPA may take a harder line next time as well. Those are mere possibilities, hypotheticals that have no bearing on this case. EPA has not approved Virginia's 2026 303(d) list, and Plaintiff cannot challenge an approval that does not exist. This Court should reject EPA's invitation to wait until the next round, because the next round is not before this Court.

## CONCLUSION

EPA is mistaken in its motion for summary judgment brief. First, this Court retains full jurisdiction over Count I, because the July 2025 action was a complete, formal 303(d) list approval, which is a final agency action that has not been vacated. Second, DEQ failed to evaluate (rather than merely collect) PFAs data in its possession beyond the fish tissue data, and

that EPA's approval of that failure to evaluate breached a clear legal duty. Third, DEQ failed to actually evaluate fish tissue data it possessed except for a reliance on health department advisories, and EPA's approval of that failure was not reasonable. Accordingly, Plaintiff respectfully requests that Defendants' motion for summary judgment be denied.

Dated: October 19, 2026

Respectfully submitted,

s/ Isak Howell

Isak Jordan Howell (VSB NO. 75011)
Appalachian Mountain Advocates
P.O. Box 2186
Roanoke, Virginia 24009-2186
isak@howell-lawoffice.com
(540) 998-7744

Michael Becher (admitted Pro Hac Vice)
Appalachian Mountain Advocates
P.O. Box 11571
Charleston, WV 25339
mbecher@appalmad.org

Claire Marie Horan (VSB No. 95386)
Appalachian Mountain Advocates
P.O. Box 403
Charlottesville, Virginia 22902
choran@appalmad.org
(907) 687-8561

*Counsel for Wild Virginia*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**AT RICHMOND**

**WILD VIRGINIA, INC.,**

**Plaintiff,**

**v.** **CIVIL ACTION NO. 3:25-cv-1043**

**UNITED STATED ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of U.S. Environmental Protection Agency; AMY VAN BLARCOM-LACKEY, in her official capacity as Regional Administrator for U.S. Environmental Protection Agency Region III,**

**Defendants.**

## CERTIFICATE OF SERVICE

I, Isak Howell, do hereby certify that on October 19, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system.

s/ Isak Howell

Isak Jordan Howell (VSB NO. 75011)
Appalachian Mountain Advocates
P.O. Box 2186
Roanoke, Virginia 24009-2186
isak@howell-lawoffice.com
(540) 998-7744